**UNITED STATES of America, Appellant,**

**v.**

**T. C. TRIGG et al., Appellees and Cross-Appellants,**

**First State Bank, Crosset, Arkansas, Appellee.**

**Nos. 71–1519, 71–1532.**

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1972.

Decided Aug. 17, 1972.

Norwood Phillips, El Dorado, Ark., for Trigg.

Karl Schmeidler, Atty., Tax Division, Department of Justice, Washington, D. C., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Attys., Tax Division, Department of Justice, Washington, D. C., for the United States; Bethel B. Larey, U. S. Atty., Sam H. Park, Asst. U. S. Atty., of counsel.

J. V. Spencer, Jr., J. S. Brooks, Spencer & Spencer, El Dorado, Ark., for First State Bank of Crossett, Ark.

Before LAY, BRIGHT, and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

On this appeal, we consider three competing claims of priority to progress payments earned by a contractor performing construction projects for two Arkansas municipalities. The United States claims priority to the funds under assessments and levies for the contractor's unpaid payroll taxes. A bank claims priority under an earlier unrecorded assignment of accounts receivable. Finally, three individuals, who agreed to indemnify the contractor's surety, claim priority as subrogees of mechanic's lienors and as successors in interest to the surety.

In an unreported opinion, the district court rejected the priority claims of the United States and awarded first priority to the bank, second priority to the indemnitors. The United States has appealed, and the indemnitors have cross-appealed; each claims first priority to the funds. For the reasons stated below, we reverse and award priority to the United States.

The parties have stipulated to the facts. On June 17, 1968, the Sutton Construction Co., Inc., entered into a contract to construct sanitary water and storm improvement facilities at McGehee, Arkansas. On August 14, 1968, the contractor entered into a similar contract with the City of Hope, Arkansas. The Maryland Casualty Company entered into performance-payment bonds, binding itself to both Arkansas municipalities as surety for the contractor under these construction contracts. In connection with the execution and issuance of the bonds, T. C. Trigg, Ovid Switzer, and Victor Scott, as individuals, entered into a "Blanket Indemnity Agreement" with Maryland Casualty Company, agreeing to indemnify Maryland Casualty for any liability which it might incur as surety for the contractor under the construction contracts.

To obtain financing for these projects, the contractor, on August 2, 1967, had executed an "Accounts Receivable Security Agreement" with the First State Bank, Crosset, Arkansas, assigning to the bank, as security for existing or future loans, all accounts receivable arising during the term of the agreement. In late 1968, the contractor directed both Arkansas municipalities to make future payments due under the construction contracts payable jointly to the contractor and the bank. Relying on the security agreement and the written directions to the Arkansas municipalities, the bank advanced approximately $15,000 to the contractor to pay for labor and to purchase materials in performing the construction contracts. At the time the bank filed the complaint against the United States, the contractor remained indebted to the bank for $13,919.41. The bank failed to file the security agreement with the Arkansas Secretary of State or with the Clerk of the Circuit Court, the offices designated by the Arkansas Uniform Commercial Code. *See,* Ark.Stat.Ann. § 85–9–401(1)(c) (1961).

For each taxable period between March 31, 1968 and March 31, 1969, the contractor failed to withhold income and to pay taxes due under the Federal Insurance Contribution Act. The amount assessed against the contractor by the government for taxes, interest, and penalties far exceeded the amount of the progress payments in question here. On March 3, 1969, the United States served a notice of levy upon McGehee, Arkansas, and received, on April 21, 1969, the sum of $10,763.59, the amount due the contractor for work performed between February 11, 1969, and March 1, 1969. On March 8, 1969, the United States served a notice of levy upon the City of Hope, Arkansas, and received, on March 20, 1969, the sum of $8,336.16, the amount due the contractor for work performed from February 1, 1969, to March 7, 1969.

On April 13, 1969, the contractor defaulted on its contracts with both Arkansas municipalities. The municipalities demanded that Maryland Casualty Company, as surety, complete performance of the contracts. Maryland Casualty, in turn, demanded that the indemnitors, Trigg, Switzer, and Scott, hold Maryland harmless under the indemnity agreement. Pursuant to Maryland's demands, the indemnitors paid the contractor's previously unpaid material and labor claimants and secured a second contractor to complete the projects.

In awarding first priority to the bank, the district court determined that the contractor's assignment of accounts receivable to the bank divested the contractor of any property interest in the progress payments. Therefore, the court reasoned, the contractor held no property interest in the progress payments which the government could attach through a tax lien.

The judgment in favor of the bank did not exhaust the full amount of the progress payments plus interest.[1] Accordingly, the district court went on to determine the relative priorities of the United States and the indemnitors against the remainder. The court awarded second priority to the indemnitors, ruling that, by making payments to the materialmen and laborers who had filed mechanic's lien claims, the indemnitors succeeded to the priority rights granted the materialmen and laborers by Arkansas law. Because we hold that the United States is entitled to the total amount of the progress payments, we need not determine the relative priorities between the bank and the indemnitors.

## BANK v. UNITED STATES

We consider first the claim of the bank against the United States. The Federal Tax Lien Law provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, additional to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person. [26 U.S.C. § 6321]

On this appeal, the bank leans heavily upon a series of Supreme Court cases holding that the Federal Tax Lien Statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law * * *." United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 1056, 2 L.Ed.2d 1135 (1958); see United States v. Durham Lumber Co., 363 U.S. 522, 526, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960); Aquilino v. United States, 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). In Aquilino the Court said:

> The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to proper-

---

1. From a fund of $21,657.54, representing the progress payments plus interest, the district court awarded $17,328.87 to the bank and $4,328.67 to the indemnitors.

ty" to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that "in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute. [363 U.S. at 512–513, 80 S.Ct. at 1280]

The bank argues that; under Arkansas law, the contractor's assignment of accounts receivable to the bank effected a transfer to the bank of the property rights in the accounts receivable, leaving the contractor with no property interest which the United States could reach under the statute.

We do not agree that, under Arkansas law, the assignment of accounts receivable placed the progress payments beyond the reach of a tax lien. Arkansas adopted the Uniform Commercial Code (UCC) in 1961. Ark.Stat.Ann. § 85–1–101 et seq. (1961). The UCC requires holders of certain security interests in property to record their interest in order to protect it from the claims of third parties. Assignees of accounts receivable fall under this filing requirement. Ark.Stat.Ann. § 85–9–302 (1961).[2] In Arkansas assignees of accounts receivable must file their interest both centrally with the Secretary of State and locally with the Clerk of the Circuit Court. Ark.Stat.Ann. § 85–9–401(1)(c) (1961).

■ Unless the security interest is perfected by filing, third party creditors may gain rights against the collateral. See Ark.Stat.Ann. § 85–9–301. The UCC subordinates the right of a holder of an unperfected security interest to the right of a "person who becomes a lien creditor without knowledge of the security interest * * * ." Ark.Stat.Ann. § 85–9–301(1)(b). The term "lien creditor" is defined as follows:

A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like * * * . [Ark.Stat.Ann. § 85–9–301(3)]

The United States qualifies as a "lien creditor" under this definition of the term. *See* L. B. Smith, Inc. v. Foley, 341 F.Supp. 810, 813–814 (W.D.N.Y.1972).

The UCC does not classify the debtor's interest in the collateral securing the debt as "property" or "rights to property," the terms traditionally used by the Supreme Court. *See* Aquilino v. United States, *supra*, 363 U.S. at 514, 80 S.Ct. 1277. The draftsmen made no attempt to fix location of title to collateral securing a creditor's interest. Ark.Stat.Ann. § 85–9–202 provides:

Each provision of [Article 9] with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor.

The comment to this section explains:

The rights and duties of the parties to a security transaction *and of third parties* are stated in this Article without reference to the location of "title" to the collateral. (Emphasis added.)

The UCC focuses on rights and duties of the secured party, the debtor, and third parties, rather than on the location of title. As a result, the draftsmen found it unnecessary to classify the legal interest held by the secured party and by the debtor in the collateral. If the secured party fails to perfect his interest, the UCC grants rights against the collateral to third party creditors regardless of the legal interest held by either the secured party or the debtor. Ark.Stat.Ann. § 85–9–301 (1961).

■ In this case, because the bank failed to file its security interest, it held only an unperfected interest in the contractor's accounts receivable. To be sure, the UCC provides some protection

---

**2.** Ark.Stat.Ann. § 85–9–302(1)(e) (1961) excepts from the filing requirement certain isolated assignments of accounts receiva-

ble. The bank has not argued that the assignment in this case falls within the exceptions created by that section.

to holders of unperfected interests by making such interests enforceable between the parties. Ark.Stat.Ann. § 85–9–201. At the same time, however, the UCC makes unperfected interests vulnerable to the claims of third parties. We hold that the contractor's assignment of accounts receivable to the bank did not place the progress payments beyond the reach of the federal tax lien. The UCC plainly provides that a lien creditor, such as the United States, may reach property securing an unperfected interest in accounts receivable:

> [A]n unperfected security interest is subordinate to the rights of * * * a person who becomes a lien creditor without knowledge of the security interest and before it is perfected. [Ark.Stat.Ann. § 85–9–301(1)(b)]

Our determination that the United States may reach the progress payments under the Federal Tax Lien Statute answers only the threshold question posed by *Aquilino:* Whether the taxpayer held an interest in property to which the federal tax lien could attach. We now must determine the priority of the competing claims. For that determination, we are bound to apply federal law. *See, e. g.,* United States v. Equitable Life Assurance Society of United States, 384 U.S. 323, 327, 86 S.Ct. 1561, 16 L.Ed.2d 593 (1966); Aquilino v. United States, *supra,* 363 U.S. at 513–514, 80 S.Ct. 1277; United States v. Security Trust & Savings Bank, 340 U.S. 47, 49, 71 S.Ct. 111, 95 L.Ed. 53 (1950); United States v. First Nat'l Bank & Trust Co. of Fargo, N.D., 386 F.2d 646, 647 (8th Cir. 1967).

Under the basic federal priority standard, "first in time is first in right," a federal tax lien takes priority over a state-created lien unless the state lien is specific and perfected in the federal sense before the federal tax lien arises. United States v. Equitable Life Assurance Society of United States, *supra,* 384 U.S. at 327, 86 S.Ct. 1561. With certain statutory exceptions, *see* 26 U.S.C. § 6323(a), a federal tax lien arises on the date of assessment. 26 U.S.C. § 6322; *see* United States v. Vermont, 377 U.S. 351, 353 n.3, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964). At the time the United States assessed the contractor's tax liability, the bank's security interest was not specific and perfected, in the federal sense, because filing was required to protect the security interest against third party creditors. *See* United States v. Crest Finance Co., 302 F.2d 568, 569 (7th Cir. 1962), on remand from 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342 (1961); *cf.* United States v. New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954).

The 1966 amendments to the Federal Tax Lien Statute expanded the classes of claims which are entitled to priority over federal tax liens. *See* S.Rep. No. 1708, 89th Cong., 2d Sess. (1966), in 3 U. S. Code Congressional and Administrative News, p. 3722 (1966). Holders of security interests are among those creditors who were granted added protection. Under 26 U.S.C. § 6323(a),[3] a federal tax lien is not valid against the holder of a security interest until the tax lien is filed. Under 26 U.S.C. § 6323(c)(1),[4] certain security interests in specified property take priority over a federal tax lien even if the security in-

---

3. 26 U.S.C. § 6323(a) provides:

   The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate.

4. 26 U.S.C. § 6323(c)(1) provides:

   To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which

   —

   (A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

   (i) a commercial transactions financing agreement,

terest comes into existence after the federal tax lien is filed. Significantly, however, Congress extended the added protection only to holders of perfected security interests by defining a security interest as follows:

> The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth. [26 U.S.C. § 6323(h)(1)]

*See* 26 U.S.C. § 6323(c)(1)(B). As a result, holders of unperfected interests remain subject to the "first in time is first in right," priority standard. Under that standard, unperfected security interests are subordinate to a federal tax lien.

Accordingly, we think it is clear in this case that the federal tax lien takes priority over the bank's security interest. If the bank had properly filed its security interest, the result would have been different under the present Federal Tax Lien Statute.[5]

## INDEMNITORS v. UNITED STATES

We now turn to the claim of the indemnitors against the United States. The indemnitors advance two alternative arguments in support of their priority claim. We reject each argument.

### A.

The indemnitors first argue that, at the time of the tax levies, the contractor possessed no property rights in the progress payments. They contend that, under equitable principles, the contractor's indebtedness to materialmen and laborers caused the property interest to pass to the materialmen and laborers and then successively to the surety and to the indemnitors through subrogation. We have not found any Arkansas authority which supports the position that the contractor's property interest in the progress payments pass to the materialmen and laborers simply because of the contractor's indebtedness to those parties.

The indemnitors advance a collateral argument that they succeeded to the rights of materialmen and laborers who filed mechanics' liens and are therefore entitled to priority for the amount of these liens. We find this argument untenable. In Arkansas, public projects are not subject to mechanics' and materialmen's liens. *See* National Surety Corp. v. Edison, 240 Ark. 641, 401 S.W. 2d 754, 756 (1966) (Smith, J., concurring). To protect mechanics and materialmen, Arkansas requires contractors to furnish a bond on public construction contracts exceeding $3,000. *See* Ark. Stat.Ann. § 51–632 (1971). At the same time, Arkansas limits the claims of mechanics and materialmen to the surety bond. *See* Ark.Stat.Ann. § 51–636 (1971); Stewart-McGehee Construction Co. v. Brewster, 171 Ark. 197, 284 S.W. 53, 54 (1926). Thus, Arkansas does not grant to materialmen and mechanics rights against either the public project

---

> (ii) a real property construction or improvement financing agreement, or
> (iii) an obligatory disbursement agreement, and
> (B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

5. The United States filed notices of the tax liens with the Circuit Clerk, Ashley

County, Arkansas, on January 15, 1969, and February 12, 1969. The bank claims priority against the progress payments for loans made to the contractor on February 21, 1969, and February 28, 1969. Although, as to these loans, the bank's security interest did not arise until after the tax liens were filed, the bank would take priority under the forty-five day rule of 26 U.S.C. § 6323(c)(2)(A) if it had perfected its security interest.

or funds in the hands of the contractor. Accordingly, the indemnitors acquired no derivative right to the progress payments through the materialmen and laborers.

### B.

▇ Secondly, the indemnitors argue that they are entitled to priority because the Federal Tax Lien Statute grants a "super priority" over a previously filed tax lien to certain classes of creditors. *See* 26 U.S.C. § 6323(b) and (c). Creditors who are required to make payments under an obligatory disbursement agreement are accorded a "super priority" under 26 U.S.C. § 6323(c)(1)(A)(iii). That section provides:

> To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence *after* tax lien filing but which * * * is in qualified property covered by the terms of a written agreement entered into *before* tax lien filing and constituting * * * an obligatory disbursement agreement * * *. (Emphasis added.)

An obligatory disbursement agreement is defined as follows:

> The term "obligatory disbursement agreement" means an agreement (entered into by a person in the course of his trade or business) to make disbursements, but such an agreement shall be treated as coming within the term only to the extent of disbursements which are required to be made by reason of the intervention of the rights of a person other than the taxpayer. [26 U.S.C. § 6323(c)(4)(A)]

The Senate Committee Report explained the priority for obligatory disbursement agreements.

> Obligatory disbursement agreement. —The third category of interest given priority over a filed tax lien is that arising from an obligatory disbursement agreement. This is an agreement entered into by a person under which he is obliged to make disbursements because someone other than the taxpayer has relied on his obligation. An example is an irrevocable letter of credit where a bank issuing the letter must honor a demand for payment by a third party who advances credit in reliance upon the letter. This also covers cases where a surety agrees to finance the completion of a contract entered into by the taxpayer. In these cases no limitation is placed on the time during which a disbursement may be made as long as the person is obligated to do so at the time of the tax lien filing by a written agreement. As a result, if an effort is made to foreclose on a Federal tax lien before all of the potential obligations under an obligatory disbursement contract are met, these potential obligatory disbursements are given priority over the Federal tax lien. In such a case an amount sufficient to cover the potential obligations usually is set aside and used for these obligations. Only after these obligations have been met is any remainder available to satisfy the liability secured by the Federal tax lien.

> Your committee's bill gives priority to interests arising under obligatory disbursement agreements as against filed tax liens since the obligation arises before the filing of the tax lien, although the disbursements are made after that time. [S.Rep.No.1708, 89th Cong., 2d Sess. (1966), in 3 U.S. Code Congressional and Administrative News, p. 3730 (1966)]

Based on the language of the statute and the Senate Committee's comments, we think that the surety, Maryland Casualty Company, would clearly be entitled to priority against the progress payments if it had actually made disbursements under the suretyship agreement. We do not believe, however, that the indemnitors are entitled to the same priority. The statute contains an important limitation on the type of creditor entitled to the super-priority. Only credi-

**1272**

tors who enter into obligatory disbursement agreements "in the course of [their] trade or business" are entitled to the priority. 26 U.S.C. § 6323(c)(4)(A). The Senate Committee Report specifically notes:

> Interests arising under these agreements are given priority over a filed tax lien only if the agreements are entered into by the disburser in the ordinary course of his trade or business. [S.Rep.No.1708, 89th Cong., 2d Sess. (1966), in 3 U.S. Code Congressional and Administrative News, p. 3730 (1966)]

In this case, the indemnitors failed to show that they assumed the obligation to indemnify the surety as an incident to their trade or business. The record shows only that Trigg was engaged in the "investment business," Scott in the real estate business, and Switzer in the practice of law. On this record, we cannot say that the indemnitors are entitled to priority under 26 U.S.C. § 6323(c)(1)(A)(iii).

In a brief submitted following oral argument, the indemnitors argue that they "acted as an extension of the surety" and consequently, "stand in the shoes of the surety." In this case, however, the surety acquired no priority rights to which the indemnitors could succeed. The provisions of the lien statute relating to obligatory disbursement agreements create a priority

> [o]nly to the extent of disbursements which are required to be made by reason of the intervention of the rights of a person other than the taxpayer. [26 U.S.C. § 6323(c)(4)(A)]

In this case, since the surety, Maryland Casualty Company, made no disbursements to materialmen and laborers, the surety did not acquire a priority over the federal tax lien. Thus, although the Federal Tax Lien Statute explicitly recognizes rights of subrogation, see 26 U.S.C. § 6323(i)(2), the indemnitors could not acquire a priority right which the surety did not hold.

## CONCLUSION

We remand this case to the district court and direct that the claims of the bank and the indemnitors be dismissed.