In re A-1 HYDRO MECHANICS
CORPORATION, Debtor.

TOWNE REALTY, INC., and Towne
Realty of Hawaii, Inc., Plaintiffs,

v.

A-1 HYDRO MECHANICS
CORPORATION,
Defendant.

Bankruptcy No. 87–00881.
Adv. No. 88–0016.

United States Bankruptcy Court,
D. Hawaii.

Oct. 19, 1988.

Colin Kurata, Ronald K. Kotoshirodo, Honolulu, Hawaii, for debtor-defendant.

Michael Chun, Honolulu, Hawaii, for creditor IRS.

Susan Tius, Honolulu, Hawaii, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

The evidentiary hearing on the ownership of certain materials turned over by A-1 Hydro Mechanics Corporation ("Defendant"), the above-named Debtor, to Towne Realty, Inc. and Towne Realty of Hawaii, Inc. (collectively "Plaintiff"), pursuant to the Order Granting Motion for Temporary Restraining Order entered herein on February 18, 1988, was held on March 29, April 26, and May 4, 1988. Appearances were made by Susan Tius, Esq. for Plaintiff, Colin K. Kurata, Esq., special counsel for Defendant, and Michael Chun, Esq. for the Internal Revenue Service ("IRS"). The Court, having heard the evidence, the representations and argument of counsel, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff is the General Contractor under a contract ("Prime Contract") with the Department of Navy, as Owner, for a project for the construction of seven buildings known as the BEQ Modernization Project ("BEQ Project").

2. On or about May 28, 1987, Plaintiff, as Contractor, entered into a Subcontract Agreement ("the Subcontract") with Defendant, as Subcontractor, for the total Subcontract price of $1,143,100.00.

3. Under the Subcontract, the Defendant agreed to furnish the plumbing, masonry and sheet metal work, equipment, and materials for the construction of the seven buildings at the BEQ Project.

4. The Subcontract includes the following terms:

(1) Within 30 days after entering into the Subcontract, Defendant will make commitments to all material suppliers and provide copies of purchase orders to Plaintiff for approval.

(2) Each purchase order must state the Government Contract Number and the date by which the materials must be delivered "FOB jobsite".

(3) Defendant will promptly make payments to all persons supplying labor, materials, and supplies; Plaintiff may make any payments which Defendant fails to make, the amounts thereof deducted from any monies earned or due the Defendant under the Subcontract.

(4) Defendant may submit an application for partial payment with required supporting data by the 25th of each month. Plaintiff will make the partial payments due Defendant by the 15th day of the following month.

(5) Such partial payments will equal the value of the work done by the Defendant according to the owner's certificate, if applicable, less a retainage of 10% for labor, materials, and equipment, and less any other amounts retained or deducted under the terms of the Subcontract.

(6) If at any time there shall be any evidence or notice of any lien or claim for which it is established that the Plaintiff is liable, the Plaintiff shall have the right to retain out of any partial payment an amount sufficient to completely indemnify itself against any such claim or lien.

(7) Upon the completion of the Prime Contract and the approval by the Government of the work, the Subcontractor will be paid the remaining amount due the Subcontractor, less an adequate retainage for warranty work, provided that the Contractor shall have the same rights and conditions as before making payment.

5. The Defendant delegated the masonry portion of the Subcontract to International Masons ("IM"), a division of the Defendant.

6. On or about June 26, 1987, the Defendant commenced performance of the Subcontract. The Defendant and IM, for the period from commencement of the

work through September 25, 1987, submitted three initial applications for payment, which applications were paid as requested less 10% retention.

7. On these initial three applications for payment, Defendant and IM certified that Defendant had paid for the labor and material costs covered by the applications. However, they had not paid their workers and suppliers and were not able to furnish releases from the workers and suppliers against the Plaintiff's surety bond.

8. All of the completed forms of applications for payment submitted by the Defendant and IM to Plaintiff from commencement of the job until termination of the Subcontract on January 25, 1988 failed to furnish releases. Such failure of Defendant and IM to furnish releases to Plaintiff is a breach of Article XVI.1.b. of the Subcontract.

9. Sometime around October of 1987, Plaintiff became aware that Defendant and IM were not paying the material suppliers and various wages and benefits owed for the work done by their employees on the BEQ Project.

10. Under the Miller Act, suppliers of materials and workers on the BEQ Project for amounts due them, but not paid, have the right to make claims against the surety bond given by Plaintiff to the Navy to secure Plaintiff's performance of the work.

11. Plaintiff, sometime in October of 1987, in order to assure that no claims were made against Plaintiff's bond, commenced paying wages to the employees of Defendant and IM, as well as making payment to union trust funds for fringe benefits and dues, material suppliers, insurance carriers, and federal and state taxes.

12. The Defendant and IM orally or in writing authorized and instructed Plaintiff with reference to the parties and amounts to be paid.

13. Pursuant to the instructions given by Defendant, Plaintiff promptly issued checks to the creditor or joint checks to the Defendant and the creditor. Additionally, Plaintiff, at the request of the Defendant and material suppliers who were not willing to extend credit to the Defendant, entered into Joint Check Agreements with Defendant and the suppliers.

14. As required by the Subcontract, Defendant had specially ordered the materials it needed for the BEQ Project. Despite the provision of the Subcontract that the materials be delivered to the jobsite, Defendant arranged for delivery of some of the materials to its warehouse.

15. During December 1987 and January 1988, Plaintiff's General Superintendent, John Hertzberg, repeatedly contacted Ken Lucky, the Project Coordinator for the Defendant, to deliver all of the materials to the BEQ jobsite. However, Defendant failed to do as requested.

16. On or about January 15, 1988, Defendant filed a Second Motion for Approval of Rejection of Certain Executory Contracts seeking Court approval to reject the Subcontract, stating that the Subcontract "will result in losses for the Estate herein and further, are not assignable for any possible benefits to the Estate."

17. Defendant delayed giving notice to Plaintiff of the Motion to reject the Subcontract for ten days, but Plaintiff learned of the Motion on January 25, 1988 through a creditor of the Defendant.

18. On January 25, 1988, without prior notice to Plaintiff, Defendant's employees came to the BEQ jobsite to pick up personal belongings, and Defendant ceased work on the Subcontract. As a result, by letter dated January 25, 1988, Plaintiff terminated the Subcontract for material and/or anticipatory breach under the provisions of Article XII, Paragraph 2. In the letter, Plaintiff cites the January 15, 1988 filing of the Motion to reject the contract and the January 25, 1988 withdrawal of the workers and certain equipment by Defendant as grounds of termination.

19. On March 16, 1988, this Court entered an Order Relative to Motion for Relief from Automatic Stay which allowed Plaintiff to terminate the Subcontract.

20. On March 18, 1988, the Court entered an Order granting the second Motion for Approval of Rejection of Certain Exec-

utory Contracts which approved rejection of the Subcontract.

21. Plaintiff, in the January 27, 1988 letter, demanded turnover of certain materials located at Defendant's warehouse which Plaintiff claims were purchased for the BEQ job and paid for by Plaintiff ("subject materials").

22. The Defendant refused to turn over the subject materials. The Defendant also refused Plaintiff's requests to inspect said materials and to be furnished a list of those materials.

23. On February 8, 1988, Plaintiff commenced this proceeding by filing a Verified Complaint for Injunctive, Declaratory and Other Relief which, among other things, asserts Plaintiff's ownership of the subject materials and the right to turnover of said materials.

24. Simultaneous with the filing of the adversary proceeding, Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction, among other things, seeking immediate turnover of the subject materials to Plaintiff.

25. On February 18, 1988, the Court entered an Order Granting Motion for Temporary Restraining Order which ordered turnover of the subject materials by Defendant to Plaintiff. The Court further ordered the Plaintiff to deposit sufficient funds into escrow, in an interest-bearing account with Plaintiff and Defendant's attorneys as co-trustees, to cover the invoiced cost of the subject materials.

26. To prevent delay in obtaining the materials which were urgently needed because of a $1,136.00 per day liquidated damages clause if two building in the BEQ Project were not completed by February 27, 1988, Plaintiff paid $75,000.00 into escrow without receiving an inventory of the materials being held by Defendant.

27. On February 12, 1988, Defendant turned over the subject materials at its warehouse to Plaintiff pursuant to the Temporary Restraining Order entered by the Court. When Plaintiff picked up the subject materials, they were segregated from Defendant's other inventory. Mean-

while, Defendant had prepared an inventory listing the quantity and description of the subject materials, which inventory Plaintiff signed, acknowledging receipt of the subject materials.

28. Though Defendant claimed that gate valves were among the items turned over to Plaintiff as part of the subject materials, the Defendant was not able to prove the number of gate valves turned over nor their cost.

29. The total cost of the subject materials, excluding the gate valves, was $37,-596.76.

30. On May 16, 1988, the Court entered an Order for Partial Disbursement of Escrow Funds releasing to Plaintiff $35,-000.00 of the $75,000.00 in escrow, after determining that the cost of the subject materials was less than $40,000.00.

31. Defendant and IM, under their applications for payment, claim a total due of $468,208.33, less a 10% retention for a net due of $421,387.50.

32. There was no evidence offered at the hearing to support the amounts being claimed by Defendant and IM under the applications for payment.

33. The applications for payment made by Defendant and IM cover work performed and stored materials acquired but not yet incorporated into the job for the application period.

34. Prior to January 1988, Defendant and IM never requested payment from Plaintiff on the applications but, instead, they directed and authorized that Plaintiff's payments be made to the creditors of the Defendant.

35. After Defendant withdrew its workers from the job on January 25, 1988, plaintiff reviewed Defendant's last application for payment for the period December 25, 1987 to January 25, 1988. As a result, Plaintiff disputes the percentage of completed work for which Defendant and IM claim payment for the period from December 25, 1987 to January 25, 1988.

36. On January 25, 1988, Plaintiff independently inspected the percentage of work which Defendant had completed and deter-

mined the percentage of completion to be substantially less than that billed under the Defendant's last application for payment.

37. Plaintiff determined the percentage of completion of flashing and sheet metal on Building 1028 to be 95% versus 100%, fire extinguishers on Building 1028 to be 88% versus 100%, plumbing on Buildings 1028 and 1029 to be 73% versus 100% and 94% respectively, and ventilation on Buildings 1028 and 1029 to be 70% as opposed to 100%, for a downward adjustment of $46,-186.00 from the $400,075.31 claimed by Defendant for an adjusted amount due Defendant of $353,889.00.

38. Plaintiff, under the Prime Contract, makes monthly pay applications to the Navy based on an estimate of values agreed to between the parties which do not necessarily correspond to actual work performed by subcontractors, such as the Defendant.

39. Plaintiff's applications to the Navy itemize the work being billed differently from the breakdown provided by the Defendant and IM in their pay applications submitted to the Plaintiff.

40. The total amount that has been paid by Plaintiff as of May 4, 1988 to the Defendant and IM and/or the creditors of Defendant and IM for expenses of performing the Subcontract is $446,482.45.

41. In addition, PAMCAH, the plumbers and masons trust fund, had demanded payment of $12,642.57 which Plaintiff was compelled to pay to prevent claims against Plaintiff's bond.

42. Thus, the adjusted amount paid out by Plaintiff to and on behalf of Defendant and IM is $459,125.02 which amount exceeds the amount claimed by Defendant and IM of $421,387.50 by $37,737.52.

43. Plaintiff, in addition to the $459,-125.02 of payments made to and on behalf of the Defendant and IM, must also pay general excise tax of 4.167% of approximately $19,000.00.

44. Also, the application for payments of Defendant and IM are based on work performed on only two of the seven buildings to be built under the Subcontract.

And, at the time Defendant left the job on January 25, 1988, it had not even completed work on those two buildings.

45. Plaintiff, on an hourly basis, hired KOA Mechanical to complete the work on the two buildings on which Defendant had worked and Plaintiff has paid KOA Mechanical $40,000.00 to complete the work.

46. The two applications for payment made by Defendant and IM submitted for the period from November 26, 1987 to December 25, 1987 and December 26, 1987 to January 25, 1988 total $279,474.05, less the 10% retention of $27,947.40, for an amount claimed of $251,526.65.

47. The subject materials were billed by Defendant to Plaintiff under these two applications for payment. Plaintiff, for the period between November 26, 1987 to January 25, 1988, has paid out $295,159.39 to Defendant's creditors, as compared to the $251,526.65 claimed to be owed by Defendant.

48. Plaintiff has other claims against Defendant. However, even without further adjustment, by applying the amounts claimed by the Defendant and IM of $251,-526.65 against the $295,159.39 paid out by Plaintiff, the Defendant owes Plaintiff the sum of $43,632.74.

49. On April 25, 1988, IM submitted an additional application for payment, claiming additional amounts owed for December 26, 1987 to January 25, 1988 of $37,118.16. The application includes "additional change orders or extra work done" on Building 1028 of $14,403.75 and on Building 1029 of $13,547.40.

50. However, change orders must be in writing signed by both parties under Article XIV of the Subcontract. IM failed to submit any written change order to which the parties had agreed. Thus, IM has failed to prove that monies are due IM for any additional work.

51. Plaintiff has paid Defendant's employees $1,521.27 for overtime, which overtime was necessitated by Defendant's failure to timely perform the Subcontract due to problems with workers who were not being paid by Defendant. And the over-

time work was to cover unprotected drywall from exposure to weather.

52. The Internal Revenue Service ("IRS") has been paid by Plaintiff in excess of $14,071.38 for tax obligations of Defendant, and the IRS has credited the payments to Defendant.

53. To the extent that these Findings of Fact constitute Conclusions of Law, they shall be so deemed.

## CONCLUSIONS OF LAW

1. Under the Subcontract, Plaintiff contracted to buy and Defendant contracted to sell and install various materials, including the subject materials; and Defendant delegated a portion of the contract to IM.

2. As Defendant did not normally stock the materials of the quantity and type needed under the Subcontract, Defendant specially ordered the materials, including the subject materials for the Subcontract.

3. Defendant and IM submitted applications for payment of $468,208.33 less a 10% retention for a net totalling $421,387.50. Defendant is not entitled to receive the full amount it claims, as this amount should be adjusted downward by another $46,186.00 for a lesser percentage of work completed than claimed by Defendant and IM in the applications.

4. After the initial application, Defendant and IM certified, as required by the Subcontract, that all work and. materials covered by previous applications had been paid even though Defendant and IM had not in fact paid for such work and materials and therefore were unable to attach releases as required by the Subcontract.

5. When Plaintiff determined that Defendant and IM had not paid for certain work and materials, it began, as specifically authorized by the Subcontract and with the authorization and pursuant to the instructions of Defendant and IM, to pay for the work and materials covered by the Applications directly to creditors through joint checks and joint checking agreements.

6. To date, Plaintiff has paid either directly to Defendant or IM, or on their behalf, together with sums paid to complete the two buildings on which Defendant and IM worked, approximately $77,737.52 more than the $421,387.50 claimed by Defendant and IM under the six applications, which include charges for the subject materials.

7. Plaintiff, for the period that Defendant billed for the subject materials, has made payments to Defendant, to IM or on behalf of Defendant of approximately $43,-632.74 more than the amounts claimed by Defendant and IM, and specifically paid for the subject materials through joint checks and joint checking agreements.

8. Plaintiff was specifically authorized by the Subcontract and Defendant to make payments on behalf of Defendant.

9. Plaintiff also has a claim for breach of contract arising from the Defendant's rejection of Plaintiff's Subcontract. 11 U.S.C. § 502(g).

10. Plaintiff is entitled to offset payments made for labor, materials and other expenses of the Subcontract against any amounts this Court later determines are due from Plaintiff to Defendant under the Subcontract. *See* Order Allowing Set–Off entered on April 29, 1987 in the case of *In re N.N. Electric Company, Inc.*, 93 B.R. 717 U.S. Bankruptcy Court for the District of Hawaii; *In re LaFollette Sheet Metal, Inc.*, 35 B.R. 634, 639 (Bankr.E.D. Tenn.1983).

11. Defendant's post-petition purchase of the subject materials from PS & S and the other suppliers would be the basis of administrative claims against Defendant if Plaintiff had not paid for these materials. 11 U.S.C. § 503.

12. Plaintiff's payments of post-petition amounts owed to material suppliers prevented administrative claims being incurred by the estate.

13. Even if Plaintiff's claim were not allowable as an administrative priority under 11 U.S.C. § 503(b)(1), there is the required mutuality to set off the balance due the creditor under its contract, against post-filing obligations due from the creditor to the debtor. *In re Mohawk Industries,*

*Inc. v. United States of America,* 82 B.R. 174, 178–79 (Bankr.D.Mass.1987) (*"Mohawk"*).

14. Plaintiff's setoff rights are consistent with the provisions of 11 U.S.C. § 553 in that the Defendant, for two months after filing the petition, chose to perform the Subcontract post-petition. *Mohawk,* 82 B.R. 174.

15. Furthermore, under the doctrine of recoupment, Plaintiff may credit unliquidated progress payments made to or on behalf of the Defendant both before and after filing of a Chapter 11 petition against value given post-petition by a Debtor under the same contract, even though the Debtor never sought approval to assume the contract. For, if a Debtor seeks benefit of a contract, it must also assume the burden under the contract. *In re Mohawk Industries, Inc. v. United States of America,* 82 B.R. 174, 178 (Bankr.D.Mass.1987).

16. Where the Debtor performs post-petition service under the contract, but has received pre-petition advances, basic concepts of fairness prohibit segregating the contract into its pre-filing and post-filing elements, for such segregation would deny the creditor the right of recoupment and permit the absurd result of giving the debtor a right to double payment. *Mohawk* at 178.

17. As to the issue of possession of the materials in storage, there is no question that Defendant asserted full right and title to such materials at all times up to the time of the turnover and took full responsibility for the same on its own account.

18. The stored materials at issue were paid for by Plaintiff on behalf of and with the consent of Defendant, either through Joint Checks or at the instruction of Defendant. All such payments were deducted against Defendants account and subcontract by the Plaintiff. Thus, the Court concludes that the materials were the property of the Debtor.

19. Even if the materials were the property of Plaintiff and delivered to the Debtor by Plaintiff for incorporation into the project, Plaintiff still would not prevail.

11 U.S.C. § 544 is the "strongarm" provision of the Bankruptcy Code, and provides in part that:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; ....

20. Uniform Commercial Code ("U.C. C.") Section 9–202 provides:

Each provision of this Article with regard to rights, obligations and remedies applies *whether title to collateral is in the secured party or in the debtor.* (Emphasis added.)

Thus, the location of title is immaterial. As the court stated in *United States v. Trigg,* 465 F.2d 1264, 1268 (8th Cir.1972):

The UCC does not classify a debtor's interest in the collateral securing the debt as "property" or "rights to property," the terms traditionally used by the Supreme Court.... The UCC focuses on the rights and duties of the secured party, the debtor, and third parties, rather than on the location of title.

See also *Wood Chevrolet Co. v. Bank of the Southeast,* 352 So.2d 1350 (Ala.1977); *American Aviation, Inc. v. Aviation Insurance Managers, Inc.,* 244 Ark. 829, 427 S.W.2d 544 (1968).

21. U.C.C. 9–102 provides in part:

(1) Except as otherwise provided in Section 9–104 on excluded transactions, this Article applies

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts; and also

(b) to any sale of accounts or chattel paper.

(2) This Article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310.

22. As noted in the Official Comments to 9–102:

The main purpose of this Section is to bring all consensual security interests in personal property and fixtures under this Article, except for certain types of transactions excluded by Section 9–104....

[T]he principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? For example, Section 9–104 excludes certain transactions where the security interest (such as an artisan's lien) arises under statute or common law by reason of status and not by consent of the parties. Transactions in the form of consignments or leases are subject to this Article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended.... When it is found that security interest as defined in Sectio 1–201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it. The list of traditional security devices in subsection (2) is illustrative only; other old devices, as well as any new ones which the ingenuity of lawyers may invent, are included, so long as the requisite intent is found. The controlling definition is that contained in subsection (1).

23. UCC 1–201(37) provides:

(37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. *The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer* (Section 2–401) *is limited in effect to a reservation of a "security interest".* The term also includes any interest of a buyer of accounts or chattel paper which is subject to Article 9. The *special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2–401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with Article 9.* Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment sales (Section 2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. (emphasis added).

24. Although UCC Article 9 does not cover liens arising from operation of law (see e.g. U.C.C. 9–104(c)). U.C.C. 9–310 does govern the priority of such a lien. U.C.C. 9–310 states:

When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

25. Plaintiff does not qualify under UCC 9–310, since Plaintiff did not deliver the goods in the "ordinary course of his business." Plaintiff is engaged in the construction business, and not in the business of selling construction material.

26. In *Amfac Mortgage Corp. v. Arizona Mall of Tempe*, 127 Ariz. 70, 618 P.2d 240 (1980), a supplier of structural steel argued that steel which had been delivered to a job site, but which had yet to be incorporated into the structure, could not be subject to a bank's security interest in the shopping center. In that case, as here, the contract was required to pass title to all materials used in construction to the shopping center free and clear of all liens and encumbrances upon satisfaction of certain conditions, including payment. The supplier argued that the mere possession of the material was insufficient to allow the bank's security interest to attach to the steel, which had not yet been paid for. The appellate court disagreed and found that at most, the supplier had reserved a security interest in the goods and, having failed to perfect that security interest, the bank's security interest in the steel took priority over the supplier's. See also *In re County Green Limited Partnership*, 438 F.Supp. 693 (W.D.Va.1977).

27. *In Morton Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210 (Okla.1977), Morton Booth Co. furnished to Tiara Furniture, Inc. raw materials to be used in the construction of gun cabinets, built to specifications of Morton Booth Co., and sold to Morton Booth Co. when the cabinets were completed. Because of Morton Booth Co.'s failure to perfect a security interest in the raw materials shipped to Tiara Furniture, Inc., the court concluded that the secured creditors of Tiara Furniture, Inc. took priority over Morton Booth Co.'s claim for return of the materials.

28. As noted by the Court in *Morton Booth Co.*, Tiara Furniture, Inc., had the right to incorporate the material into a finished product, and thus did not merely have possession of the goods:

Booth cites *Cain v. Country Club Delicatessen of Saybrook, Inc.*, 25 Conn.Sup.

327, 203 A.2d 441 (1964), for the proposition that mere possession of goods is not enough under the Code to demonstrate that the debtor had "rights" in the collateral. We agree with the general proposition. The provisions of Article 9 were never intended to give rise to a security interest where the debtor was, for example, a mere gratuitous bailee. The cases generally hold, however, that where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach. *In re Samuels & Co., Inc.: Stowers v. Mahon*, 526 F.2d 1238 (5th Cir.1976); *First National Bank of Elkhart County v. Smoker*, Ind.Ct.App., 11 U.C.C.Rep. 10 (1972); *Evans Products Co. v. Jorgensen*, 245 Or. 362, 421 P.2d 978 (1966). Tiara had substantial rights in the materials supplied by Booth other than mere possession. Primary among Tiara's rights was the right to incorporate the materials into a product for sale.... Under the contract Tiara had the right to use the materials provided in the manufacture of gun cabinets, and sell the finished product to Booth. Also, Tiara had the right to use the materials provided in the manufacture of gun cabinets, and sell the finished product to Booth. Also, Tiara had substantial legal rights in the goods in its possession. Tiara had a security interest of its own in the materials Booth provided and in Tiara's possession for the payment of accounts due under the contract to manufacture and sell the gun cabinets.... The right of a debtor to enforce a security interest in his favor over goods in the debtor's possession has been held to be sufficient rights in the collateral to allow a creditor's security interest to attach. *In re Samuels & Co., Inc.: Stowers v. Mahon, supra.* (Emphasis added.)

29. There is no question that, in the instant case, Plaintiff failed to perfect its security interest by failing to file a financing statement as required by UCC 9–302. As the holder of an unprotected security interest, Plaintiff is subordinate to the

rights of a person who becomes a lien creditor before the security interest is perfected. Thus, under 11 U.S.C. § 544, the trustee would take priority over the Plaintiff's interest.

30. Plaintiff argues that the relation between Plaintiff and Debtor was that of a bailor-bailee. A bailment is the rightful possession of goods by one who is not the owner. 9 S. Williston, *Contracts* 875 (3d ed. 1967) cited with approval in *Waugh v. University of Hawaii*, 63 Haw. 117, 130, 621 P.2d 957, (1980).

31. Plaintiff cites the case of *In the Matter of Ray Slattery, Inc.*, 54 B.R. 642 (Bankr.N.J.1985) for the proposition that supplies purchased by a debtor/subcontractor, with funds obtained from a project owner pursuant to a construction contract were property of the owner. In that case, the court found that the materials were not part of the debtor/subcontractor's estate as its possession of them constituted a mere bailment.

32. The Court is not persuaded by *Ray Slattery, Inc.* It appears that no other court has followed its reasoning, which is directly contrary to the provisions of the U.C.C.

33. As provided in U.C.C. 2–401,

Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place and in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

34. The court thus concludes that Plaintiff has only an unperfected security interest in the goods purchased and delivered to the Defendant. Although this is a seemingly harsh result, as noted in *Amfac Mortgage Corp. v. Arizona Mall of Tempe*, 127 Ariz. 70, 74, 618 P.2d 240, 244 (1980),

While these rules have a harsh impact on Reppel as an unpaid supplier, it should be noted that Reppel could have protected itself and obtained priority over Amfac by simply perfecting its purchase money security interest. . . .

35. To the extent that these Conclusions of Law constitute Findings of Fact, they shall be so deemed. The Court shall enter judgment accordingly.

### JUDGMENT

Pursuant to the Findings of Fact and Conclusions of Law entered herein on Oct. 19, 1988,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant is the owner of the subject materials obtained for the BEQ Project which Defendant held at Defendant's warehouse until turnover to Plaintiff on February 12, 1988.

IT IS FURTHER ORDERED, AD-JUDGED AND DECREED that escrow shall pay to the trustee of the Debtor's estate an amount equal to the amount of goods obtained by Plaintiff from Defendant. The trustee shall hold these funds, subject to the liens of First Hawaiian Bank and Internal Revenue Service.

IT IS FURTHER ORDERED, AD-JUDGED AND DECREED that Plaintiff shall be allowed an unsecured claim in the amount of monies paid out of escrow to the Debtor.

IT IS FURTHER ORDERED that escrow shall pay the balance of the funds remaining to Plaintiff.