**INTERNATIONAL FIDELITY INSURANCE COMPANY, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 90–2974.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1991.

Decided Nov. 27, 1991.

install drywall at a construction site. The government, on behalf of the Internal Revenue Service, claims that it is entitled to the funds because Prudential has an outstanding tax debt. International Fidelity Insurance Company, which assumed Prudential's obligations after it defaulted, claims that it is entitled to the payments as Prudential's surety on the construction contract. Responding to cross-motions for summary judgment, the District Court held for International Fidelity. *International Fidelity Ins. Co. v. United States*, 745 F.Supp. 578 (E.D.Mo.1990). On the government's appeal, we affirm in part and reverse in part.

### I.

The parties stipulated to the following facts. On November 13, 1987, Prudential agreed to install drywall at a St. Louis Housing Authority construction site. In order to guarantee completion of Prudential's work on the job and the payment of any bills it incurred in connection with the job, International Fidelity issued surety bonds on November 19, 1987, on behalf of Prudential as principal and the Housing Authority as obligee.

Prudential began its full-time work on the job on June 13, 1988. Despite Prudential's promise to complete its work by the end of July, it did not do so. Although the general contractor threatened on August 9 to have Prudential's work completed for it if it did not complete its work by August 12, Prudential's workers remained at the site through the beginning of September. At that point, Prudential hired another contractor to complete its work, but that contractor quit in mid-October before completing the job because Prudential did not pay it.

On September 22, 1988, the Housing Authority warned Prudential in writing that it would replace Prudential if it did not complete its work on that date. That same day, the Housing Authority suspended further payments to Prudential. International Fidelity learned of these problems from the Housing Authority on October 7. On October 18, 1988, the Housing Authority termi-

Joan I. Oppenheimer, Washington, D.C., argued (Gary R. Allen and Robert S. Pomerance, Washington, D.C., and Stephen B. Higgins, St. Louis, Mo., on brief), for appellant.

David B. Young, Kansas City, Mo., argued (G. Steven Ruprecht, on brief), for appellee.

Before ARNOLD, Circuit Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

ARNOLD, Circuit Judge.

This is a dispute over who is entitled to two progress payments earned by a contractor, Prudential Construction Systems, Inc., which defaulted on its obligation to

nated Prudential. The next day, the Authority contacted International Fidelity and asked it to complete Prudential's job as surety. By paying the contractor Prudential had not paid and by hiring another contractor to complete the job, International Fidelity honored its obligations. Thus far International has spent a total of $48,-388.50 pursuant to the bonds, with additional unpaid claims of $16,699.52 for labor and materials.

Prudential's inability to complete its contract with the Housing Authority was only one of its problems. On September 14, 1987, and November 3, 1987, the IRS assessed against Prudential unpaid payroll taxes in the amount of $38,616.23. The IRS filed a notice of tax lien for this deficiency on March 22, 1988. On June 7, 1988, the IRS served a tax levy on the Housing Authority demanding that it pay any money it owed to Prudential to the IRS in order to satisfy the tax deficiency. In response to the levy, the Housing Authority paid $31,067.00—representing earned but unpaid payments for work in progress—to the IRS on August 8, 1988.

The IRS served the Housing Authority with a second tax levy for any money owed to Prudential on August 30, 1988. This levy reflected three assessments for unpaid payroll taxes made against Prudential: one on March 25, 1985, with a tax lien filed on December 16, 1988; a second on June 27, 1988, with a tax lien filed on November 28, 1988; and a third on an unknown date, without a tax lien's being filed. The Housing Authority again complied with the IRS's request by paying the IRS $16,-562.28—this money was also earned for work in progress, but had yet to be disbursed—on September 28, 1988. As of that date, the Housing Authority had not yet terminated its contract with Prudential. Prudential's workers, however, were no longer on the job site.

In February 1989, International Fidelity brought this wrongful-levy action against the government under 26 U.S.C. § 7426 to recover the funds the Housing Authority paid to the IRS. It argued that as a completing surety, it had an equitable right of subrogation to the progress payments which dated back to the execution date of the surety bonds. Since International Fidelity issued the surety bonds prior to both of the tax levies, it argued that its claim had priority over the IRS's liens. The District Court adopted this reasoning and entered judgment for International Fidelity. The government appealed.

## II.

■ In granting summary judgment in favor of International Fidelity, the District Court did not cite any provisions of the Internal Revenue Code. The parties agree, however, that 26 U.S.C. § 6323(c) governs resolution of this case. We quote its relevant provisions:

Protection for certain commercial transactions financing agreements, etc.

(1) In general. To the extent provided in this subsection, even though notice of [tax] lien ... has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) ...,

(ii) ..., or

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

Section 6323(c) gives certain claims which were not choate at the time of the tax-lien filing—i.e., definite in amount—priority over the federal tax lien. The dispute in this case, then, is over whether International Fidelity's claim to the progress payments qualifies for priority under the statute.

The parties agree that International Fidelity's interest in the progress payments meets most of the requirements of § 6323(c). There is no claim that International Fidelity's interest in the progress

payments was choate at the time the IRS served the tax levies. The progress payments are "qualified property" covered by a written surety agreement or "obligatory disbursement agreement" entered into by International Fidelity in the ordinary course of its business. See 26 U.S.C. § 6323(c)(4) (defining "qualified property" and "obligatory disbursement agreement"). The parties also agree that the relevant "local law" for purposes of § 6323(c)(1)(B) is the law of Missouri.

■ The source of contention is whether International Fidelity's claim is "protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation." As a preliminary matter, International Fidelity argues that this provision gives the government only a judgment under Missouri law, not a lien. In order to establish a lien on Prudential's progress payments, International argues, the government must execute upon the judgment by providing "proper service of garnishment." Appellee's Brief at 13. Since the government did not secure a lien in accordance with Missouri law, International claims the government has no right to the funds. We decline International Fidelity's invitation to read "lien" out of the phrase "judgment lien." For purposes of the statute, "judgment lien" means the government is assumed to have a lien on the funds that has been perfected as a matter of local law. The focus of the "local law" dispute is not whether the government has a perfected lien, but whether International Fidelity's claim would nevertheless take priority over it.

Only if International Fidelity's claim has priority under Missouri law over a judgment lien obtained on the same date as the tax lien can it prevail. International Fidelity argued below, and the District Court agreed, that under Missouri law it had an equitable right of subrogation to the progress payments which related back to the date it issued the bonds. Since the

bonds issued on November 19, 1987—long before the government's tax liens—International Fidelity's equitable right to the funds preceded and therefore had priority over the government's liens. Under this view, the actual date of Prudential's default—which triggered the surety's obligation to perform under its bonds—is irrelevant. We disagree with this interpretation of Missouri law.

The District Court adopted the analysis used in *Kansas City, Missouri v. Tri–City Construction Co.*, 666 F.Supp. 170, 173 (W.D.Mo.1987), that "[s]uretyship law provides the surety an equitable lien to funds owing to a principal upon the surety's performance of the principal's obligation, which relates back to the time the contract of suretyship was executed." Relying on this general principle, the *Tri–City* Court held that a completing surety's claim to undisbursed progress payments had priority over a federal tax levy served after the date of execution of the suretyship agreement. In our view, *Tri–City* was wrongly decided in this respect.

Missouri decisions do contain language to the effect that a surety's interest in money retained by an obligee or owner relates back to the date of execution of the suretyship agreement. See, *e.g., United States Fidelity & Guar. Co. v. Missouri Highway and Transp. Comm'n*, 783 S.W.2d 516, 521 (Mo.App.1990); *Division of Employment Security v. Trice Constr. Co.*, 555 S.W.2d 65, 67 (Mo.App.1977). These cases, however, involved retainages—percentages of progress payments withheld by the owner or obligee until successful completion of the contract—not undisbursed progress payments. The dispute here does not concern which party is entitled to the contract retainage of $15,127.33 currently held by the Housing Authority. Indeed, the government concedes that International Fidelity has priority to these funds as the party which successfully completed the contract.[1]

---

1. Despite the presence of general language in support of its position, we find International Fidelity's reliance on *Housing Authority of Mexico, Missouri v. General Insurance Co. of Amer-* *ica,* 392 F.Supp. 65 (E.D.Mo.1974), misplaced. *General Insurance* involved priority to a retainage, not progress payments. Moreover, the

■ While the completing surety's equitable lien on the retainage relates back to the date of the suretyship agreement, its lien on progress payments does not. In *National Surety Corp. v. Fisher*, 317 S.W.2d 334 (Mo.1958), the Missouri Supreme Court held that a surety's equitable lien on progress payments made to a contractor prior to the contractor's default did not relate back to the date of the suretyship agreement. The Court noted the Missouri general rule "that when sums earned under the contract are paid generally to the contractor, such funds are thereby freed of any equity or right of subrogation in the surety." *Id.* at 345. The animating principle behind the general rule is the free flow of commerce: parties which receive the progress-payment funds from the contractor should not have to concern themselves with potential future claims to the money.

It is true that *National Surety Corp.* involved progress payments already made to a contractor, instead of being held by the owner or obligee as was the case here. The policy of not encumbering earned progress payments with potential future liens applies equally, however, to those payments not yet in the hands of the contractor. In *First State Bank v. Reorganized School District R–3*, 495 S.W.2d 471 (Mo.App.1973), the Missouri Court of Appeals was presented with the issue of which of two claimants had priority to a retainage and an undistributed progress payment of a defaulting contractor held by an obligee: a surety which completed the contract or a bank which had been assigned the contract's proceeds after execution of the suretyship agreement.

Consistently with the Missouri cases we have cited, the Court held that the surety had priority to the retainage because its

equitable lien related back to the execution of the performance bond. The Court was not willing, however, for the surety's interest in an undisbursed progress payment to relate back to the same date. Rather, the Court held that the surety's interest in an earned, but undisbursed, progress payment did not arise until the date of the contractor's default. If the default occurred before the progress payment was due, then the surety was entitled to the progress payment. Since the lower court had not addressed the issue, the Court remanded the case for a determination of the contractor's default date.

The rationale of *First State Bank* governs here.[2] International Fidelity's claim of priority to Prudential's progress payment depends upon the date of Prudential's default. If Prudential defaulted before the IRS filed its notices of tax lien, then International Fidelity has priority to the funds over the government. On the other hand, if Prudential defaulted after the IRS filed the tax liens, the IRS was free to seize the funds to satisfy Prudential's outstanding tax debt. As we have noted earlier, the District Court relied on the relation-back doctrine and therefore did not address the issue of Prudential's default date.

Despite the significance of Prudential's default date, we need not pinpoint it exactly in order to decide which party has priority to the funds in this case. The government is entitled to the funds it seized pursuant to the first tax levy. The IRS filed its first notice of tax lien on March 22, 1988, and served the corresponding tax levy on the Housing Authority on June 7, 1988, for $38,616.23 in unpaid payroll taxes. Since Prudential began its full-time work on the Housing Authority project on June 13, 1988, and originally promised to

opinion did not cite any Missouri law on the issue.

**2.** It is true that in *United States v. Trigg*, 465 F.2d 1264, 1271 (8th Cir.1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973), we indicated that a surety would be entitled under 26 U.S.C. § 6323(c) to a contractor's progress payments levied upon by the IRS prior to the contractor's default date. This language from *Trigg*, however, is dictum. In *Trigg*, the surety

did not make any payments under its agreement with the contractor. Three individuals who agreed to indemnify the surety made the payments. The dispositive question was whether the individuals agreed to indemnify the surety in the ordinary course of their business as required by § 6323. The Court disposed of their claim when it answered no to this question. Moreover, the local law applicable to the dispute in *Trigg* was the law of Arkansas.

complete its work by the end of July, it could not have been in default as of March 22. The IRS is therefore entitled to the $31,067.00 seized pursuant to the first tax levy.

International Fidelity, however, is entitled to the funds seized pursuant to the second tax levy. Although the IRS served the second tax levy for three assessments of deficiency on August 30, 1988, it never filed a tax lien with respect to one of the assessments, and did not file tax liens for the other two until November 28 and December 16, 1988. The crucial date for deciding whether a claim is protected under local law pursuant to § 6323(c) is "the time of tax lien filing[.]" For purposes of § 6323, "tax lien filing" means "the filing of notice ... of the lien imposed by [the assessment of taxes]." 26 U.S.C. § 6323(h)(5). The government claims that its tax levy of August 30, 1988, is equivalent to a tax-lien filing under § 6323. Our response to the government's argument is the same response we earlier gave to International Fidelity: we decline to ignore the plain language of the statute.[3] The statute speaks of the date of tax-lien filing, not the date of a tax levy. Even under the government's theory of the case, Prudential had defaulted by November 28, 1988. Therefore, at the time of tax-lien filing, International Fidelity had priority to the funds under local law.

### III.

To summarize: we reverse the judgment of the District Court with respect to the first tax levy. Accordingly, judgment for the government shall be entered in the amount of $31,067.00. We affirm the judgment of the District Court with respect to the second tax levy. International Fidelity is entitled to these funds as the completing surety. The cause is remanded to the District Court with directions to enter judgment in accordance with this opinion.

It is so ordered.

trict Court with directions to enter judgment in accordance with this opinion.

It is so ordered.

---

**3.** While it is true that the levy brings the funds within the constructive possession of the government, this does not mean—contrary to the government's assertion—that International Fidelity cannot later prove it had a superior right to the funds at the time of the levy. If we were to hold otherwise, we would eliminate the ability of claimants to bring wrongful-levy actions against the government.