AMERICAN AVIATION, INC. *v.* AVIATION
INSURANCE MANAGERS, INC.

5-4575                                    427 S. W. 2d 544

Opinion delivered May 13, 1968
[Rehearing denied September 3, 1968.]

*Crouch, Blair & Cypert,* for appellant.

*Little, Enfield & Lawrence,* for appellee.

CARLETON HARRIS, Chief Justice. Appellee, Aviation Insurance Managers, Inc., hereafter called A.I.M., instituted suit seeking to recover from appellant, American Aviation, Inc., hereafter called American, a 1961 Cessna 172 Skyhawk aircraft of the alleged value of $3,125.00. A bond was filed by appellee, but a cross-bond was filed by appellant, and the airplane remains within the possession of appellant. This plane was damaged in an accident in Texas in May, 1965. The registered owner in the office of the Administrator of the Federal Aviation Agency, Oklahoma City, is Texas Airmotive Company, Inc., hereafter called T.A.C., of Bryan, Texas. The plane was insured by appellee, and on June 7, 1965, appellee issued a settlement draft in payment of the loss to T.A.C., and received in return a signed bill of sale to

the aircraft on a Federal Aviation Agency form. The name of the buyer was left in blank. The plane was taken to Weiss International Airport at San Antonio, Texas, where a number of salvage bids were received, the highest bid being made by Charles Collier in the sum of $3,125.00, which was accepted. Collier had previously purchased aircraft salvage from appellees. On June 13, 1965, Walter Kostich of Tulsa, Oklahoma, went to the Weiss Airport for the purpose of picking up the airplane, and the aircraft was delivered to him by a representative of A.I.M., apparently under the belief that Kostich was acting for Collier. The log books for the engine and aircraft were forwarded to Collier. On June 23, 1965, Collier was informed by letter from A.I.M. that the company understood that he had picked up the aircraft, and he was advised that the bill of sale would be immediately forwarded upon receipt of his draft in the amount of $3,125.00. Upon Collier's making inquiry as to whom the draft should be made payable, A.I.M. advised that it should be made payable to the company. Thereafter, several letters seeking payment were sent to Collier, and on October 22, 1965, following a telephone request by Collier, A.I.M. sent a customer sight draft to a Dallas bank, which was returned "unpaid," and a second sight draft was also returned stamped likewise.

On March 31, 1966, A.I.M. received a request from Mr. Kostich to forward a bill of sale to him. Thereupon, the insurance company made an investigation, and learned the following facts:

Kostich, after obtaining the craft in San Antonio, took it to Tulsa, Oklahoma, and had the wings rebuilt. On September 8, 1965, Collier gave Kostich a bill of sale for the airplane, and was paid $1,000.00 by Kostich, the latter applying for registration of the aircraft in his name, but the application was rejected by the Federal Aviation Agency, because Kostich did not have a bill of sale from the registered owner, T.A.C. On

November 20, 1965, Kostich sold the aircraft to American, and gave that company a bill of sale. Appellant paid Kostich $4,175.00, and likewise made application for registration, but the application was rejected for the same reason that the application by Kostich had been rejected. In the meantime, American took the aircraft to Rogers Municipal Airport, Rogers, Arkansas. The case was tried on stipulated testimony, and on October 18, 1967, the Benton County Circuit Court ordered American to deliver possession of the plane to A.I.M., or upon its failure to do so, awarded appellees a money judgment in the amount of $3,125.00, together with interest. From the judgment so entered, appellant brings this appeal.

The question in this litigation is very simple, "Who owns the airplane?" This is a case of first impression in this state, and there does not seem to be a great deal of case law over the country. Appellee's contention is that it holds the executed bill of sale from the registered title holder, is the owner, and therefore, is entitled to the aircraft, i. e., A.I.M. stands in the shoes of T.A.C., having paid that company the loss on the plane, and having received the bill of sale in return. Appellant's argument is that it is a bona fide purchaser of the plane without notice that anyone other than Kostich was claiming any interest thereto.

Congress has preempted the field of registration and recording of title instruments affecting civil aircraft. *Pacific Financial Corporation* v. *Central Bank and Trust Company*, 5 Cir., 296 F. 2d 68. A central office has been established at Oklahoma City, Oklahoma for this purpose. Pertinent portions of 49 U.S.C.A. § 1403, provide as follows:

"(a)  The Administrator shall establish and maintain a system for the recording of each and all of the following:

(1)  Any conveyance which affects the title to, or

any interest in, any civil aircraft of the United States;
* * *,,

This covers sales, mortgages, leases, contracts of conditional sale, or any other instrument executed for security purposes. Subsection (c) provides as follows:

"No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft, aircraft engine or engines, propellers, appliances, or spare parts against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Administrator: * * *"

Appellee did not record its bill of sale from T.A.C.; in fact, it is still holding same in blank, and as stated, its contention is that it still holds title to the aircraft, since it is holding the bill of sale. According to Bill McKamey, manager of the New Orleans office of A.I.M., the reason that his company did not record the bill of sale was due to the fact that the company was following the customary practice in the aircraft salvage business. The witness stated that a salvage buyer often sells the salvage to someone else, and it may change hands two or three times before a salvage buyer delivers it to the ultimate purchaser; the latter then receives the bill of sale with his name inserted, and files it with the Federal Aviation Agency. The reason, according to McKamey, is to avoid delay and eliminate the costs of registering the aircraft with every person who purchases the salvage.

"Our customary procedure in salvage cases is to deliver the blank bill of sale to the salvage buyer upon receipt of the salvage money. The salvage buyer then delivers it to his buyer, if any. When the last buyer receives the bill of sale, he then files it with the Federal

Aviation Agency. The bill of sale was never delivered by Aviation Insurance Managers, Inc. in this case because the salvage money has never been paid."

We do not agree that there was no conveyance of the plane from A.I.M. to Collier, even though no bill of sale was given to the latter. A.I.M., according to the stipulated testimony, sold the craft to Collier. McKamey's testimony reflects:

"Mr. Collier had previously purchased aircraft salvage from our company in behalf of Oak Grove Airport. It was my understanding that this was what he was doing in the present case."

"* * * *We sold the salvage to Mr. Collier* [our emphasis.] We looked to him for payment and we held the bill of sale for delivery to him upon payment of the salvage price. This is the only manner in which business has been done with Mr. Collier in the past."

The stipulated testimony of both Collier and Kostich appears in the record, but we do not see that their testimony is particularly pertinent to the determination of this litigation. Collier testified that he bought the Cessna for Kostich, and he said that he advised McKamey of this fact, telling the latter that Kostich was to pay for the plane.

According to Kostich's testimony, he purchased the plane from Collier, received a bill of sale from the latter, who at the same time promised to obtain a bill of sale from either T.A.C. or A.I.M.

It has previously been pointed out that Congress has preempted the field as far as recordation and registration of aircraft is concerned, but we do not mean to say that Congress has preempted the entire field relating to conveyances of aircraft, for it has been held otherwise. In *Aircraft Investment Corp.* v. *Pezzani & Reid*

*Equipment Company,* 205 F. Supp. 80 (1962), the United States District Court E. D. Michigan, S. D., said:

"Plaintiff suggests that Congress has preempted the entire field of conveyancing of interests in aircraft. This view is erroneous, notwithstanding In re Veterans' Air Express Company, 76 F. Supp. 684 (D. N. J. 1948), which contains dicta on which plaintiff relies. Congress has said only that until an instrument purporting to convey an interest in an aircraft is recorded, in accordance with the Act, it is void as to third parties without notice. Upon federal recordation, it is valid without further recording. In providing for the recordation of various instruments pertaining to transactions affecting title or interest in aircraft, Congress has not impaired the existence and effectiveness of state laws creating and defining such instruments. Excepting the recording section of the Federal Aviation Act, the validity of the chattel mortgage here in question must be measured by the appropriate state law."

Appellee did not plead the application of the Texas statutes,[1] and the law of this state applies.

Let us then look to our appropriate statutes. Ark. Stat. Ann. § 85-2-106 (Add. 1961), being a part of the Uniform Commercial Code, states:

"* * * A 'sale' consists in the passing of title from the seller to the buyer for a price."

This section then refers to § 85-2-401. Subsection (2) of the last section provides:

"Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical de-

[1] Ark. Stat. Ann. § 27-2504 (Supp. 1967) provides that a party who intends to raise an issue concerning the law of any jurisdiction or governmental unit outside this state shall give notice in his pleadings or other reasonable written notice.

livery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading * * *.''

We have already pointed out that McKamey's testimony flatly states, ''We sold the salvage to Mr. Collier.'' The plane was physically delivered to Kostich (for Collier) though the document of title was to be delivered at a different time. Under subsection (2), just quoted, it appears that title passed to the buyer when the aircraft was delivered. Appellee, in holding on to the blank bill of sale, was actually endeavoring to reserve a security interest in the plane—but whatever interest was retained, even had there been a conditional sale— or a chattel mortgage—had to be recorded in the central office to become valid as against innocent purchasers. We are not concerned with the validity of the sale from A.I.M. to Collier (or Kostich) as it affects the rights between those parties; we are only concerned with their transaction as it affects the rights of appellant.

Under the evidence, there is no doubt but that appellant was a good faith purchaser; in fact, it is not otherwise argued. In *State Securities Co.* v. *Aviation Enterprises, Inc.,* 355 F. 2d 225 (1966), the question of the recording of conveyances was discussed. That litigation was affirmed on the basis of two points, the second being that a chattel mortgage on an airplane was invalid, as to a purchase made in good faith from the mortgagor, where the mortgagee had not followed the provisions of Section 1403 (c). The court said:

''Further, under § 1403 (c), supra, Securities' mortgage is invalid as to good faith purchasers, since it did not register its mortgage with the Federal Aviation Agency. And the failure of Owens to register its title does not benefit Securities, since Securities must

stand on the strength of its own title and cannot recover on the weakness of Owens's title.''

Reversed.

GEORGE ROSE SMITH, J., dissents.

GEORGE ROSE SMITH, Justice, dissenting. The governing federal statute, quoted by the majority, reads in part:

> ''No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid . . . against any person other than the person by whom the conveyance or other instrument is made or given . . . until such conveyance or other instrument is filed for recordation in the office of the Administrator.''

An essential element in the Congressional scheme is that the conveyance or other instrument be *in writing*, so that it *can* be recorded. So interpreted, the statute achieves a worthwhile result, by requiring a registration of aircraft titles similar to that which applies to motor vehicles and the title to land. I think we ought to adhere to the basic requirement that the instrument of conveyance be in writing, else the registration system loses much of its practical value. I would reject the appellant's assertion of title, on the ground that the legislative intent to give *de facto* validity to unrecorded conveyances was intended to apply only to written instruments.