Larry G. MILLIGAN *v.* GENERAL OIL COMPANY, INC.

87-151                                              738 S.W.2d 404*

Supreme Court of Arkansas
Opinion delivered November 2, 1987

*Justice Hickman's concurring and dissenting opinion may be found at 740 S.W.2d 908.

402

*Hively & Ketz*, by: *Wesley J. Ketz, Jr.*, for appellant.

*Highsmith, Gregg, Hart, Farris & Rutledge* and *Wright, Lindsey & Jennings*, for appellee.

JACK HOLT, JR., Chief Justice. At issue in this action is whether the appellee's above ground gasoline storage tanks constitute a nuisance.

Appellee General Oil Company, Inc. ("General Oil") operates a convenience store/gasoline service station, in a predominantly commercial location approximately five miles south of Batesville. The business fronts on the east side of Highway U.S. 167 in the community of Southside. There are several fuel pumps placed in front of the store and four above ground gasoline storage tanks with a total capacity of 21,000 gallons located approximately fifty-seven feet behind. The storage tanks have been in their present location for at least 14 years.

Appellant Larry Milligan ("Milligan") has operated a grocery store which is south of and adjacent to General Oil's location since 1983. His store also fronts Highway U.S. 167 and is located approximately eighty-one feet from General Oil's storage tanks. The ground slopes naturally downhill from the General Oil property to the grocery store property.

On April 17, 1986, Milligan filed suit in Independence County Chancery Court alleging that because of numerous incidents of fuel spillage, the storage tanks constituted a private and public nuisance. He asked for a permanent injunction to abate the alleged nuisance and for damages. In his decree on February 10, 1987, the chancellor found that the storage tanks did not constitute a nuisance or warrant an injunction. The

chancellor awarded Milligan $1,000.00 as compensation for damages caused by the negligence of General Oil's employees in allowing fuel to escape into the grocery store parking lot and for the time and effort Milligan expended in cleaning up debris that General Oil had washed upon his land.

From the judgment of the chancery court, Milligan appeals. General Oil cross-appeals on the ground that the trial court erred in awarding $1,000.00 in damages to Milligan.

■■ Although chancery court cases are reviewed *de novo* on the record, the findings of the chancellor will not be set aside unless they are found to be clearly erroneous. Ark. R. Civ. P. 52(a); *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984). Since the question of the preponderance of the evidence turns to a large extent on the credibility of the witnesses, we should give deference to the chancellor. Under the circumstances, we cannot say the findings of the Chancellor were clearly erroneous.

■ "Nuisance is defined as conduct by one landowner which unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property which disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property." *Ark. Rel. Guidance Fdn.* v. *R. J. Needler*, 252 Ark. 194, 477 S.W.2d 821 (1972). "Equity will enjoin the conduct which culminates in a private or public nuisance where the resulting injury to the nearby property and residents, or to the public, is certain, substantial, and beyond speculation and conjecture." *Id*. The distinction between private and public nuisance is simply the extent of the injury, *i.e.* the number of persons suffering the effects of the nuisance. *Id*.

■■ The mere diminution in the value of property or of the business by the nuisance, without irreparable injury, will not furnish sufficient cause for equitable relief. *Gus Blass Dry Goods* v. *Reinman*, 102 Ark. 287, 143 S.W. 1087 (1912). "The nuisance must be of a consistent, recurring and permanent nature, and from such nuisance there must flow injuries causing substantial, tangible and material discomforts and inconvenience, which result in a loss of health, loss of trade, partial but substantial destruction of business or the ruin of property, and the deprivation of its use and enjoyment to a material and substantial extent, before a court of equity will interfere by injunction to restrain the

maintenance of, or to abate the alleged evil." *Id.*

It is well settled that a filling station is not a nuisance *per se. See Phillips* v. *Adams,* 228 Ark. 592, 309 S.W.2d 205 (1958); *Moore* v. *Wallace,* 191 Ark. 511, 56 S.W. 1111 (1935). It has also been held that storage of fuel does not constitute a nuisance *per se. Hilliard* v. *Shuff,* 260 La. 384, 256 So.2d 127 (1971). However, such storage may be a nuisance if it creates a substantial likelihood of fire or explosion in the future. *See Phillips* v. *Allingham,* 38 N.M. 361, 33 P.2d 910 (1934). The mere fear or apprehension of danger from fire or explosion due to the existence of gasoline storage tanks does not, in and of itself, justify injunctive relief. *Id.*

Since storage tanks cannot be considered a nuisance *per se,* the burden is upon the complaining party to show that it is a nuisance in fact by clear and satisfactory evidence. *Flippin* v. *McCabe,* 228 Ark. 495, 308 S.W.2d 824 (1958). Whether or not General Oil's storage tanks constitute a nuisance is largely a question of fact. *Phillips* v. *Adams, supra.* The chancellor held that the mere fear of apprehension of danger from fire explosion due to the existence of gasoline storage tanks without more is not sufficient to justify an injunction and that it is necessary to show a reasonable certainty that such results are actually threatened, rather than merely anticipated. We agree. The storage tanks have been in their present location for at least 14 years. Interruption to Milligan's business caused by gas spills or other activities has been infrequent and temporary in nature. Likewise, General Oil has been in substantial compliance with the rules and regulations of the State Fire Marshal's Office pertaining to above-ground storage tanks, and there is no substantial proof that General Oil's activities resulted in pollution. In short, the proof does not support the claim that General Oil was using its property in an unreasonable, unwarranted, or unlawful manner. Injunctive relief is not warranted by the circumstances.

On cross-appeal General Oil contends that the chancellor erred in awarding Milligan $1,000.00 in damages in that the record is void of any evidentiary basis for the award. We likewise agree. Under our law, a party seeking damages has the burden of proving his claim, and if no proof is presented to the trial court that would enable it to fix damages in dollars and cents,

the court cannot award damages. *Winkle* v. *Grand Nat'l Bank*, 267 Ark. 123, 601 S.W.2d 559 (1980).

The sole testimony on the issue was from cross-appellee Milligan:

Q. What do you say your damages are?

A. Well, I really can't put, I really can't put a dollar figure on it, you know, I mean, I just can't put a dollar figure on it.

Q. Okay, in our complaint we listed $20,000.

A. Right.

Q. Are you asking the judge for that much money today?

A. No, I'm just asking to get part of my money back, you know, that I've been out. I'm not —

Q. You're asking the judge to reimburse you for your loss.

A. Yes, sir, I would like to have that.

Q. And for your time and labor of having to clean up the trash?

A. Well, I'd like to have that. It'd be nice.

Q. Right. And can you put an exact dollar figure on that?

A. On—?

Q. Your loss of business?

A. No sir, I sure can't.

Q. But you don't have any doubt you've lost some business?

A. I don't have any doubt that I've lost some, no, no doubt at all but I can't say how much, no.

Q. You're willing just to leave it up to the judge?

A. Yes, sir.

The only other evidence of damages is that Milligan repaved his parking lot. However, Milligan testified that the parking lot

had been there for some time and the spilled gasoline did not cause all of the problem:

Q. But it's your testimony and your contention that the occurrences in February of '84 and December of '84 and January 16th, '85 were the only reasons you had to have your parking lot repaved?

A. No, Sir, I don't believe I said that.

Q. Okay. What did you say?

A. I said it caused certain areas, you know to come up there. I'm not saying it caused the 100 percent of it. Maybe the parking lot had been there. I'm sure it had some damages already done to it, you know over the few years. I mean, I'm not saying, no, that's what blowed up the whole parking lot, no. I didn't say that, but I did say it helped a lot to do that.

Q. Are any of those incidences, those three incidences that occurred before you had your parking lot resurfaced, any of the ones you referred to when you said that raw product was running over your lot:

A. Repeat that.

Q. Let me ask it another way. Wouldn't it be fair to say that on all three occasions before you had your lot repaved, the product was washed off by the fire department, so it was mixed with water?

A. I'd have to look at those dates and see and get lined back up on which—they've been so many I can't keep up with them.

Q. Well, there were only three before you had your lot repaved.

A. The diesel come across there, the one spill was before, it was raw diesel went across there.

Q. That was when the pump was knocked over?

A. Yes.

Q. December 1st, 1984? And I think Mr. Candler

Q. testified, Arnold testified that these pumps were knocked over and they came out and washed the spill away? Do you remember that?

A. I'm not sure.

Q. Do you remember back on November 24th when I took your deposition over at Mr. Ketz's office?

A. Yes, Sir.

Q. And do you remember me asking you about the status of your lot right now and how it looked?

A. Yes, Sir.

Q. And do you remember telling me, I asked you on page 45, "What's the condition of your parking lot right now?" And your answer was, "To look at it right now, it looks pretty good because it's packed."

A. Yes.

Q. Is that still your testimony, it still looks pretty good?

A. Yes, Sir.

Q. So, all these occurrences that have happened since you've had it repaved, your lot still looks pretty good?

A. Just to look at it, it looks fairly well. But I don't know how much breakdown to the oil, the contact in the gravel, I don't know how much it's broke down and I don't know how long it's going to last.

Q. But it looks pretty good to look at it?

A. To look at it, it look pretty good, but I don't know have much it's broke down.

As can readily be seen from the above quoted testimony, the chancellor could not have fixed damages with any degree of certainty. The damages were fixed only by sheer speculation. The chancellor erred in allowing Milligan $1,000.00 in damages. Therefore, we reverse this award on cross-appeal.

Affirmed in part; reversed in part.

HICKMAN and HAYS, JJ., concur in part and dissent in part.

GLAZE, J., agrees with majority on direct appeal but concurs with results reached on cross-appeal.

PURTLE, J., dissents.

DARRELL HICKMAN, Justice, concurring in part and dissenting in part. I agree with the majority's decision except for that part which strikes the chancellor's award of $1,000 damages. If one reviews a record backwards, that is, contrary to accepted principles of appellate review, one could perhaps conclude that the chancellor's finding was wrong.

But, our job is not to see if it was wrong; rather we look to see if there is any way to uphold it. We are bound to consider the evidence in a light most favorable to the appellee. *E. I. DuPont Nemours & Co.* v. *Dillaha*, 280 Ark. 477, 659 S.W.2d 756 (1983).

The appellee proved that it cost $4,600 to repave his parking lot. While spillage of gasoline and diesel fuel by the appellant did not cause all of this damage, undoubtedly it was the main cause of the parking lot's deterioration. The appellee testified as follows:

> I didn't say the occurrences in February, 1984 and December, 1984 and January 16, 1985 were the only reasons I had my parking lot repaved. I said it caused certain areas to come up there. I'm not saying it caused 100% of it. I'm sure it had some damages already. I'm not saying that's what blowed the whole parking lot. I did say it helped a lot to do that. . . .
>
> * * * *
>
> The defendants had to re-cover their parking lot after this fire incident. They re-covered their parking lot the same time, the same day I re-covered mine. That was on November 6, 1985. I covered it with hot mix. It is a two inch covering. Whoever did my lot, they did theirs the same date. I filled some, tried to repair it, to put some concrete in or, I bought some "cold mix" like they rework the highway with, that fills holes, but the water and stuff coming down through there just kept it spewed up all the time. I finally just sealed it. It was a while after I moved in and started

running the grocery store that I did any work on the parking lot. After I had bought the store, it had one little hole in it. That's what I'm talking about, refixing it. It wasn't any major cost like this was or anything. I didn't do anymore work to it until I had it resurfaced.

I had some diesel running over it in December, 1984. It was about a year later in November, 1985, when I had it resurfaced. It just went to falling apart. After the spills went across it, I noticed it. I didn't notice it the next day. It's a pretty busy place. There is quite a lot of traffic. It just starts peeling a little. You're there working every day. You don't notice it. The first thing you know, you look out there and there's a big hole. I'd say after the first spill, I started noticing it disintegrating about a month or two later. . .

Mark Lambert, an employee of the asphalt company that resurfaced the parking lot, testified as follows:

. . . I think you would have to determine how long the diesel and gas were in contact with the hot mix. The longer it's on there, the more damage it's going to do. There is no question that diesel and gas would be detrimental to the hot mix. I would say within a year or so, you would know if any deterioration was to become obvious.

The diesel or gas dissolves and washes away tar in the hot mix, the asphalt cement.

The trial judge could easily have concluded that at least $1,000 of the cost of repaving was attributable to the negligence of the appellant. I would, therefore, affirm the award.

HAYS, J., joins.

JOHN I. PURTLE, Justice, dissenting. The majority has added insult to injury in my opinion. The facts clearly establish that the appellee oil company continues to maintain above ground oil storage facilities which do not meet the minimum safety standards of the State Fire Code. State Fire Marshal Ray Carnahan testified that since 1965 the Code has required that storage tanks for flammable liquids be placed underground. Testimony indicates these tanks were placed in their present above ground location sometime between 1970 and 1973. In any event, above

ground tanks are required to have a dike large enough to contain the spill of the largest tank in the compound. The present concrete block retaining wall or dike does not meet the safety requirements of the Code for above ground storage tanks. The state fire marshal, after inspecting this dike stated: "There are cracks in the mortar joints. Some of the mortar has given way or dropped out—It needs to be bigger. It also needs to be repaired so there is not any cracks in the mortar." The fire marshal has referred this matter to the attorney general for appropriate action.

The local fire department has been called to the scene of these tanks at least nine times within a three year period. The danger of fire or explosion is ever present. Gasoline or diesel has overflowed onto the appellant's property several times. After one such overflow the appellant felt compelled to resurface his driveway and parking area at a cost of $4,500. The dike has constant seepage and there is trash and grass which could easily cause a fire. The public, including school children, are constantly in the area and some even sit on the dike while waiting for the bus or other things.

I feel no need to set out in detail additional testimony and evidence which seems to me to compel reversal of this case. I feel confident the trial court was clearly erroneous in refusing to enjoin this nuisance which may well cause serious injuries or death or at least great property damage. The evidence was more than sufficient to support the damage award and most certainly required an injunction.