EMERALD DEVELOPMENT COMPANY *v.*
James McNEILL and Theodore Beitel

CA 02-1159                    120 S.W.3d 605

Court of Appeals of Arkansas
Division IV
Opinion delivered May 14, 2003

*Law Office of David W. Cahoon, PLC*, by *David W. Cahoon*, for appellant.

*Gill Elrod Ragon Owen & Sherman, P.A.*, by: *John P. Gill* and *Roger H. Fitzgibbon, Jr.*, for appellee.

ANDREE LAYTON ROAF, Judge. Emerald Development Company (Emerald) appeals from a circuit court order enjoining it from operating an airport at its current location in Cleburne County. Emerald argues that the trial court's jurisdiction was preempted by the Federal Aviation Act and that there was no proof of a nuisance or irreparable harm that would justify the issuance of an injunction. We affirm.

Emerald owns a real estate development on the eastern side of a portion of Greers Ferry Lake known as The Narrows. In April of 2001, it began construction of a small private airport for the use of its residents. The airport was slated for construction in an east-to-west manner, with east being away from The Narrows and west heading toward The Narrows. Construction of the airport ceased when, on June 4, 2001, appellees James McNeill and

Theodore Beitel sued Emerald, seeking an injunction to prohibit operation of the airport. McNeill and Beitel (collectively "McNeill") own property in the Bondair lakefront development, directly across the lake on the western side of The Narrows. Bondair has a small airport for the use of its residents and guests, which has been in existence for approximately thirty years. It is laid out in an approximate north-to-south direction, parallel with The Narrows' shoreline. McNeill alleged that the proximity of the Emerald airport to the Bondair airport created an overlap in air traffic patterns, presenting a safety hazard.

The case went to trial on the theory that Emerald's airport constituted a nuisance. The evidence established that the two airports are four-tenths of a mile apart at their closest point and eight-tenths of a mile apart from center to center and that neither airport has a tower or ground control of any kind. As a result of the airports' proximity, their traffic patterns would overlap significantly, a fact that caused the Federal Aviation Administration (FAA) to object to Emerald's proposed construction (although the objection was advisory only and had no force of law). McNeill's two expert witnesses, R.V. Stewart and Jim Burnett, the former Chairman of the National Transportation Safety Board, testified that the closeness of the two airports and the ensuing traffic pattern overlap created an unreasonably dangerous situation that would ultimately result in a midair collision. Stewart testified that the situation was a "disaster waiting to happen," and Burnett stated that the "stacking" of risk factors, *i.e.*, usage of the airports by non-business pilots, the fact that most midair collisions happen in the traffic pattern or on landing or takeoff, the proximity of these two airports, and the conflicting traffic patterns, created a situation in which "there's no way to make these two airports operate safely together aligned as they are."

Emerald's expert, Dr. Jerry Robinson, testified that, with some modification of the traffic patterns, the two airports could operate safely. He recommended that Bondair's traffic pattern be oriented strictly to the west of the airport, which would require pilots in the pattern to use right-hand turns. The evidence showed that, typically, a traffic pattern is laid out so that, once the plane enters the pattern, it makes only left-hand turns.

After the hearing, the trial judge ruled that Emerald's airport created a dangerous situation and could be operated safely only if Bondair airport users employed onerous procedures to avoid the danger. He then issued the requested injunction, and this appeal followed.

■ Emerald's first argument is that the trial court's authority to enjoin the operation of the airport was preempted by the Federal Aviation Act. In any preemption analysis, the overriding principle that must guide our review is whether Congress intended to preempt state law. *25 Residents of Sevier County v. Arkansas Highway & Transp. Comm'n,* 330 Ark. 396, 954 S.W.2d 242 (1997). However, the historic police powers of the states are not to be superseded by a federal act unless that is the clear and manifest purpose of Congress. *NEF v. Ag Servs.,* 79 Ark. App. 100, 86 S.W.3d 4 (2002). The burden is on the moving party to prove that Congress intended to preempt state law. *Id.*

■ The doctrine of federal preemption is based upon the United States Constitution's Supremacy Clause. U.S. Const. art. 6, cl. 2. There are three types of preemption: 1) express preemption, where Congress defines explicitly the extent to which its enactments preempt state law; 2) field preemption, where Congress's regulation of a field is so pervasive or the federal interest so dominant that an intent to occupy the entire field can be inferred; and 3) conflict preemption, where state law stands as an obstacle to the accomplishment of the full purposes and objectives of a federal statute or where compliance with both laws is impossible. *Hale v. State,* 336 Ark. 345, 985 S.W.2d 303 (1999). Emerald concentrates its argument on appeal on the field preemption aspect, arguing that the trial court's injunction was an attempt to regulate airspace, a field that belongs to the federal government. This argument is based on the Federal Aviation Act's grant to the federal government of exclusive sovereignty of United States airspace. *See* 49 U.S.C.S. § 40103(a) (1998).

■ ■ Field preemption occurs when 1) the scope of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the state to act, or 2) when federal law touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. *See English v. General Elec. Co.,* 496

U.S. 72 (1990). Although the Federal Aviation Act gives the federal government exclusive sovereignty over U.S. airspace, the area of land-use regulation is still within the purview of state government. *See Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996), *cert. denied*, 519 U.S. 823 (1996) (holding that a city's prohibition of the operation of seaplanes on a lake was not preempted and stating that the federal government's regulation of aircraft in flight is distinguishable from the regulation of the designation of plane landing sites, which involves local control of land use); *Condor Corp. v. City of St. Paul*, 912 F.2d 215 (8th Cir. 1990) (holding that a city's denial of permit to construct a heliport was not preempted and stating that there was no conflict between a city's regulatory power over land use and the federal regulation of airspace); *see also* 49 U.S.C.S. § 40120(c) (1998), which provides that a remedy under the Act "is in addition to any other remedies provided by law," and 14 C.F.R. § 157.7(a) (2003), which recognizes local authorities' jurisdiction over land use.

▇▇ ▇▇ The circuit court in this case was not engaged in the regulation of airspace but in the regulation of land use. The court prohibited the operation of Emerald's airport because its location on nearby land interfered with Bondair's use of its airport. Although it is obvious that any regulation of an airport's location will in some manner touch on the field of aviation, for state regulation to fall within the zone of preemption, it must have some direct and substantial effect on the decisions made by those who regulate airspace. *See English v. General Elec. Co., supra.* Not every state law that in some remote way may affect a federally regulated area is preempted. *See id; see also American Aviation, Inc. v. Aviation Ins. Mgrs., Inc.*, 244 Ark. 829, 427 S.W.2d 544 (1968) (holding that, although federal law governed the recording of title instruments to airplanes, it had not preempted the entire field related to conveyances of aircraft). The circuit court in this case did not define or restrict what portions of the airspace could be used by either party. Instead, it issued a ruling that Emerald could not construct the airport at its present location. We therefore conclude that the trial court's action was not preempted by federal law.

▇▇ Emerald argues next that its airport.did not constitute a nuisance. Its primary contention is that the finding of a nuisance in this case is based on nothing more than speculation that a midair collision may occur in the future. A nuisance is

defined as conduct by one landowner that unreasonably or unlaw-
fully interferes with the use and enjoyment of the lands of another
and includes conduct on property that disturbs the peaceful, quiet,
and undisturbed use and enjoyment of nearby property. *Miller v.
Jasinski*, 17 Ark. App. 131, 705 S.W.2d 442 (1986). Equity will
enjoin conduct that culminates in a private or public nuisance
where the resulting injury to the nearby property and residents, or
to the public, is certain, substantial, and beyond speculation and
conjecture. *Id.* The general rule is that, in order to constitute a
nuisance, the intrusion must result in physical harm[1], as distin-
guished from unfounded fear of harm, which must be proven to
be certain, substantial, and beyond speculation and conjecture.
*Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999). The find-
ings of a trial judge as to the existence of a nuisance will not be
overturned unless they are found to be clearly against a preponder-
ance of the evidence. *See Miller v. Jasinski, supra.*

Emerald relies on *Milligan v. General Oil Co.*, 293 Ark.
401, 738 S.W.2d 404 (1987), for its holding that a mere fear or
apprehension of danger, without more, is not sufficient to warrant
injunctive relief for abatement of a nuisance. However, *Milligan* rec-
ognized that an activity could constitute a nuisance if it created a
substantial likelihood of danger in the future or if it could be shown
to a reasonable certainty that danger was actually threatened rather
than merely anticipated. Both of McNeill's experts in this case testi-
fied that the location of the Emerald airport presented a disaster
waiting to happen. We can hardly disagree that, if two uncontrolled
airports are aligned in a perpendicular manner such that the ends of
each runway are less than a half-mile apart, danger is substantially
likely and actually threatened to a reasonable certainty. Further, we
note that the trial court's finding of a nuisance was based not only
on the dangerous aspect of the airport configurations but on the fact
that, if the Emerald airport were constructed, the Bondair airport
could be safely operated only by employing atypical right-hand
turns in the traffic patterns. The evidence showed that the use of a
left-hand pattern was more common and that, while regular users of
Bondair could be informed about the change, the airport was some-

---

[1] Physical harm does not necessarily mean direct physical damage to the premises.
*Osborne v. Power*, 318 Ark. 858, 890 S.W.2d 570 (1994), *cert. denied*, 515 U.S. 1143 (1995).

times used by non-regular users who, if they failed to be diligent in seeking out the information, could be unaware of the change.

Emerald relies on a survey of aviation activity compiled by the Aircraft Owners and Pilots Association, which recites the small number of midair collisions that occurred during the thirty million flight hours flown in the United States in the year 2000. Those statistics mean very little here. They cannot take into account the increased risk of a midair collision engendered by the layout of these two airports. Additionally, the report itself notes that forty-nine percent of the midair collisions occurred in traffic patterns and that midair collisions occur mainly on good VFR (visual flight rule) days, at low altitude, close to airports.

Emerald's final argument is that McNeill had an adequate remedy at law, making issuance of an injunction improper. Emerald contends that the trial court's injunction was based on the possibility that personal injury and property damage could occur if a midair collision took place and that these types of injuries can be redressed in a court of law.

The grant of an injunction is reviewed *de novo* on appeal and rests within the sound discretion of the trial judge. *See Brown v. SEECO, Inc.*, 316 Ark. 336, 871 S.W.2d 580 (1994). The prospect of irreparable harm or lack of an otherwise adequate remedy at law is at the foundation of the power to issue injunctive relief. *Compute-A-Call, Inc. v. Tolleson*, 285 Ark. 355, 687 S.W.2d 129 (1985).

In issuing the injunction, the trial court's purpose was not to prevent McNeill from suffering personal injury or property damage as the result a midair crash; its purpose was to allow McNeill to continue reasonable usage of the Bondair airport. Thus, Emerald's argument is not well-taken. In any event, if a trial court perceives that a dangerous incident is substantially likely to occur as the result of a certain activity, we are loath to say that the court may not enjoin that activity simply because the people injured or killed might be monetarily compensated.

We likewise reject Emerald's argument that the trial court failed to consider the fact that Emerald had already spent $100,000 in construction costs. There is no evidence that the trial court failed

to consider this fact and weigh it in the balance against the danger presented by the completion and use of the Emerald airport.

Affirmed.

PITTMAN and NEAL, JJ., agree.