AVIATION CADET MUSEUM, INC. *v.*
Tom HAMMER and Sue Hammer

07–830

283 S.W.3d 198

Supreme Court of Arkansas
Opinion delivered April 17, 2008

*Hensley Law Firm, P.A.*, by: *James E. Hensley, Jr.*, for appellant.

*Kelley Law Firm*, by: *Glenn E. Kelley*, for appellees.

J IM HANNAH, Chief Justice. This case involves a dispute between adjoining land owners. Appellant Aviation Cadet Museum, Inc. (ACM) operates a privately-held, public-access airport on its lands, and appellees Tom and Sue Hammer use a portion of their property for purposes of flying gas-powered remote-controlled or RC airplanes. Aircraft landing and taking off from ACM's airport pass directly through airspace above the Hammer property. Carroll County Road 207, which is approximately twenty-five feet wide, lies between the two parcels of land. ACM appeals from the order of the Carroll County Circuit Court finding that ACM's airfield was a nuisance and enjoining ACM from using its airfield for purposes of allowing airplanes to land and depart therefrom. The circuit court further ordered that the injunction was to remain in effect until such time, if any, that ACM could demonstrate to the court that it could operate its airfield in a manner that would not constitute a nuisance, would not trespass on the Hammer property, and would otherwise be operated in conformity with the law.

On appeal, ACM contends that the circuit court abused its discretion in enjoining ACM from using its property as an airport. ACM asserts that the use of its property as an airport, with only twenty-four operations per year, does not constitute a nuisance. Finally, ACM asserts that the provisions set forth in Arkansas Code Annotated section 27-116-102 (Repl. 1994) do not prevent the lawful use of property for airplane operations.[1] We hold that the circuit court did not abuse its discretion in issuing an injunction to enjoin ACM from using its airport for purposes of allowing airplanes to land and depart therefrom.

---

[1] We note that, in its point on appeal, ACM cites to Arkansas Code Annotated section 27-116-101 (Repl. 1994); however, section 27-116-101 has no bearing on the issues in the instant appeal, and ACM cites to section 27-116-102 in its argument.

The record reveals the following facts. The Hammers own 291 acres, twenty-three of which were purchased May 17, 1995, and on which they constructed their current residence. An additional 185 acres was purchased March 28, 1996, and the remaining eighty-three acres was bought May 22, 2000. The Hammers occupy the property and use it for residential purposes.

Tom Hammer, a licensed, instrument-rated pilot, has participated in building and flying RC planes since 1982. RC planes generally weigh up to fifty-five pounds, with wingspans up to ten feet, and fly at altitudes of 50 to 400 feet at speeds up to eighty miles per hour.

After purchasing the Carroll County property, Mr. Hammer commenced flying RC planes there with a flying club. Initially, the RC planes were flown in an area immediately north of the Hammer home. Because of space limitations, some flights crossed County Road 207. In 1997, Mr. Hammer considered the road crossing to pose some danger, so he moved the flight area a few hundred feet north to its current location.

In 2000, Mr. Hammer built two RC runways and a pavilion. RC planes typically fly on the Hammer property four to five days per week, weather permitting. In addition, Mr. Hammer hosts two annual weekend flying events that attract fifty to seventy-five pilots with multiple RC planes and approximately 250 participants and spectators.

Errol Severe, a commercial pilot who is retired from Delta Airlines, incorporated ACM as a nonprofit corporation to build a museum commemorating military aviators. On June 28, 2001, ACM purchased approximately seventy-three acres of property and constructed the museum. Currently, there are several buildings and fighter aircraft on site. Five hundred to one thousand people visit the museum each year, and it receives $50,000 to $60,000 per year in donations.

Mr. Severe was aware of the RC plane activity on the Hammer property when he made the ACM purchase. Nevertheless, he contacted the Federal Aviation Administration, seeking permission on behalf of ACM to build an airport on the ACM property. By letter dated July 13, 2001, the FAA informed Mr. Severe, among other things:

> The Federal Aviation Administration (FAA) has completed an Airspace Utilization Study No. 01-ASW-1031-NRA for the acti-

vation of a privately owned public-use airport, Silver Wings Field, near Eureka Springs, Arkansas. We have no objection to the proposal from an airspace utilization standpoint.

This determination should not be construed to mean FAA approval of the physical development involved in the proposal nor as approval of its effect on the environment. It is only a determination with respect to the safe and efficient use of airspace by aircraft. In making this determination, the FAA has considered matters such as:

1. The effect the proposal would have on existing or contemplated traffic patterns of neighboring airports,

2. The effects it would have on the existing airspace structure and projected programs of the FAA, and

3. The effects that existing or proposed manmade objects (on file with the FAA) and known manmade objects within the affected area would have on the airport proposal.

This determination in no way preempts or waives any ordinances, laws, or regulations of any other governmental body or agency. . . . Additionally, we wish to advise that the FAA cannot prevent the construction of any other structure near an airport. Protection of the airport environs can be accomplished only through such means as local airport zoning ordinances and acquisition of property rights.[2]

ACM began constructing a grass airfield in April 2002 and landed the first plane in September 2002. The runway is approximately 1900 feet long and runs generally in a north and south direction with a flight path through the Hammer RC flying area. The south edge is approximately ten feet from County Road 207 and approximately thirty-five feet from the Hammer property. There is no fence between the airfield and County Road 207. The ACM airfield is said to have a 212-foot displaced threshold;

---

[2] The court notes that, although the Federal Aviation Act gives the federal government exclusive sovereignty over United States airspace, the area of land-use regulation is still within the purview of state government. *Emerald Dev. Co. v. McNeill*, 82 Ark. App. 193, 198, 120 S.W.3d 605, 609 (2003) (citing *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996), *cert. denied*, 519 U.S. 823 (1996); *Condor Corp. v. City of St. Paul*, 912 F.2d 215 (8th Cir. 1990); 49 U.S.C.S. § 40120(c) (1998); and 14 C.F.R. § 157.7(a) (2003)).

however, the threshold is not marked. The altitude of the ACM airfield is approximately 1570 feet above sea level. The altitude of the Hammer property is approximately 1585 feet above sea level at the lowest point in the RC flying area and rises to approximately 1600 feet above sea level at its highest point.

The south end of ACM's runway is approximately 500 feet from the north edge of the Hammer flying area for RC planes. The ACM airfield has no landing lights delineating the field and has no navigation system. The airfield does not have a fixed base operator. There are no operating planes permanently based or located at the ACM airfield. Approximately twenty-four visiting aircraft use the runway each year. In addition, ACM has a yearly fly-in, in which military helicopters and fighter aircraft fly by over the property at lower altitudes without landing.

The southerly landing approach to the ACM airfield requires planes to fly at extremely low altitudes in the airspace over the Hammer property. Planes taking off to the south likewise enter the Hammer property at low altitudes.

On November 15, 2005, the Hammers filed suit to enjoin ACM from using its property as an airport. In their complaint, the Hammers alleged that ACM had operated its airfield in a manner that resulted in overflights and low level "buzzing" of the Hammer property at altitudes substantially less than 500 feet. The Hammers alleged that such activity constituted a nuisance. They further contended that ACM's operation of its airfield violated their surface rights to the enjoyment of their property in violation of Arkansas Code Annotated section 27-116-102. Additionally, the Hammers sought damages.

ACM filed an answer and a counterclaim for nuisance on January 11, 2006. In its counterclaim, ACM alleged that the Hammers' operation of RC planes was hazardous to pilots attempting to land full-scale planes at ACM's airport. ACM sought to enjoin the Hammers from operating any RC planes on their land and in the flight path of ACM's airport. ACM also sought damages.

Subsequently, the Hammers filed an amended complaint. Again, they asserted that ACM's operation of its airfield was in violation of Arkansas Code Annotated section 27-116-102 and they alleged that ACM's activity constituted a nuisance. In addition, the Hammers asserted that the actions of ACM and its invitees and guests constituted a common-law trespass. In their

amended complaint, the Hammers no longer sought damages; they did, however, continue to seek an injunction. ACM filed an amended answer and counterclaim, reasserting its nuisance claim and seeking an injunction, but no longer seeking damages.

On February 16, 2007, the circuit court held a hearing on the claims of the Hammers and ACM. On April 26, 2007, the circuit court entered an order enjoining ACM from using its airport for landing and departing airplanes until such time as ACM could demonstrate that its operations would not constitute a nuisance to the Hammers. In addition, the circuit court dismissed ACM's counterclaim for nuisance.

At issue is whether the circuit court erred in granting an injunction preventing ACM from using its airfield for purposes of allowing planes to land and depart therefrom. This court reviews injunctive matters de novo. *City of Dover v. City of Russellville*, 363 Ark. 458, 215 S.W.3d 623 (2005). The decision to grant or deny an injunction is within the discretion of the trial judge. *Id.* The court will not reverse the judge's ruling granting or denying an injunction unless there has been an abuse of discretion. *See id.* In reviewing the lower court's findings we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.*

ACM asserts that the circuit court erred in concluding that the operation of ACM's airport constituted a nuisance. ACM's position is that its use of its property as an airport with twenty-four operations per year, with one landing and departure constituting one operation, is not a nuisance. Further, ACM contends that both parties can use their land in a manner that would not be a nuisance. ACM states that it is able to change the landing pattern of arriving and departing aircraft to avoid flying over the Hammer property and that it can issue a NOTAM (notice to airman) with the FAA that all aircraft in the vicinity will observe the presence of RC planes in the area. ACM also appears to assert that an injunction is an improper remedy because it has improved its property at an incredible cost and because the museum was established for a worthy cause and has benefited the citizens of, and visitors to, Carroll County.

Nuisance is defined as conduct by one landowner that unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property that disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property.

*Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999). Equity will enjoin conduct that culminates in a private or public nuisance where the resulting injury to the nearby property and residents, or to the public, is certain, substantial, and beyond speculation and conjecture. *See id.* The general rule is that, in order to constitute a nuisance, the intrusion must result in physical harm,[3] which must be proven to be certain, substantial, and beyond speculation and conjecture. *See Se. Ark. Landfill, Inc. v. State*, 313 Ark. 669, 858 S.W.2d 665 (1993). A mere fear or apprehension of danger, without more, is not sufficient to warrant injunctive relief for the abatement of a nuisance. *See Milligan v. Gen. Oil Co.*, 293 Ark. 401, 738 S.W.2d 404 (1987). However, an activity can constitute a nuisance if it creates a substantial likelihood of danger in the future or it can be shown to a reasonable certainty that danger was actually threatened rather than merely anticipated. *See id.* Indeed, nuisances have been found when the property owners' use and enjoyment of their property was made much more difficult, and the offensive activity created a risk of physical danger. *See Osborne v. Power*, 318 Ark. 858, 890 S.W.2d 570 (1994) (affirming the finding of a nuisance where an elaborate display of Christmas lights created a risk of physical danger to property owners, passing motorists, and pedestrians); *Emerald Dev. Co. v. McNeill*, 82 Ark. App. 193, 198, 120 S.W.3d 605, 609 (2003) (affirming the trial court's finding of a nuisance based upon the dangerous aspect of airport configurations and the substantial likelihood that a midair collision would occur).

It is only the unreasonable use or conduct by one landowner which results in unwarranted interference with his neighbor that constitutes a nuisance. *See Goforth, supra* (citing *Miller, supra*). The findings of a trial judge as to the existence of a nuisance will not be overturned unless they are found to be clearly against a preponderance of the evidence. *Miller, supra.*

---

[3] Physical harm does not necessarily mean direct physical damages to the premises. *See Osborne v. Power*, 318 Ark. 858, 890 S.W.2d 570 (1994), *cert. denied*, 515 U.S. 1143 (1995). In *Osborne*, we noted that nuisances can exist when the property owners' use and enjoyment of their property was made much more difficult, and the offensive activity was abusive to senses of hearing and smell. 318 Ark. at 862, 890 S.W.2d at 572 (citing *Se. Landfill, supra* (smells from landfill); *Higgs v. Anderson*, 14 Ark.App. 113, 685 S.W.2d 521 (1985) (noise from dog kennel); *Baker v. Odom*, 258 Ark. 826, 529 S.W.2d 138 (1975) (noise from a motorcycle race track)).

Numerous witnesses testified at the hearing that they saw planes flying at extremely low altitudes over the Hammer property and over County Road 207. Owen Tromberg, retired from the United States Air Force and a licensed pilot, testified that he observed a plane crossing the Hammer property at an altitude of approximately thirty feet and crossing County Road 207 at an altitude of approximately fifteen feet. Mr. Tromberg stated that he believed the flight activities to and from the ACM airfield were dangerous.

Dave Arnett, a former United States Marine, testified that he observed two full-scale planes cross County Road 207 and the Hammer property at an altitude of approximately twenty to thirty feet. According to Mr. Arnett, the full-scale planes flying over County Road 207 are a safety hazard. Mr. Arnett also complained about the noise from the full-scale planes circling over his residence near the ACM field.

Mark Sterling, retired from the United States Air Force and an airman who served as part of a military disaster recovery team, testified that on two occasions a plane taking off from the ACM airfield almost struck his vehicle on County Road 207 next to the Hammer property. Mr. Sterling said that he and the pilots had to take measures to prevent the planes and his vehicle from striking each other. Mr. Sterling testified that, in one instance, the pilot had to "hop the plane a little bit" to get over his vehicle during his landing, and in another instance, the pilot had to "pull hard" to clear his vehicle. Mr. Sterling testified that he thought it was unsafe for planes to land at the ACM airfield and that he considered the area "a major hazard."

Jason Kissic, an RC plane pilot, testified that an observer on the Hammer property cannot see or hear a plane taking off from the ACM airfield until the full-scale plane is practically over the Hammer property. He testified regarding two incidents that had occurred while he was on the Hammer property. He stated that the first incident took place when he was acting as a spotter, and that as an RC plane was taxiing to take off, a V-tailed Bonanza took off and pulled to the right-hand bank. Mr. Kissic stated that the pilot of the Bonanza flew over the top of him "within fifty feet," and that he "could see the whites of [the pilot's passenger's] eyes." Mr. Kissic related that the incident was "so loud and abrupt, it was frightening."

Mr. Kissic testified that, in a second incident, he was flying his RC plane, and a full-scale plane flew in close proximity to him.

He stated that he feared for the safety of human life, and he has not flown RC planes at the Hammer property since the second incident.

Dale Locander, who has flown RC planes on the Hammer property, testified that he had observed a plane struggle to gain altitude while taking off from the ACM airfield and crossing the Hammer property at a low altitude. He also testified that he had seen airplanes fly low across County Road 207. David Powell, who lives near the ACM airfield, testified about the disruptive noises generated by the full-scale planes.

In its order, the circuit noted that many witnesses testified they observed planes flying at extremely low altitudes over the Hammer property and over County Road 207 and that each witness described the situation as dangerous. The circuit court also made findings regarding the glide angle, which reflects the horizontal feet a plane will fly for every vertical foot. Mr. Hammer testified that the glide angle was 20:1, while Mr. Severe of ACM testified that the glide angle was 15:1. The circuit court found:

> With a 20:1 glide angle and a 212 feet touch down requirement (displaced runway), a plane landing from the south at the ACM airfield will enter the north end of the Hammer flying area at 35.6 feet above ground level (AGL), will cross the Hammer property line at 12.35 feet AGL, and will cross County Road 207 at 11.1 feet AGL. The same plane landing with a 15:1 glide ratio will enter the north end of the Hammer flying area at 47.4 feet AGL, cross the Hammer property line at 16.4 feet AGL and cross County Road 207 at 14.8 feet AGL. Planes making a left turn in or a right turn out will fly over the south end of the Hammer flying area at 96.6 to 127.4 AGL. In the unfortunate event a pilot fails to recognize the 212 foot runway displacement, he or she could enter the Hammer flying area at 25-33.3 feet AGL, cross the Hammer property line at 2.2 to 3 feet AGL and cross County Road 207 at .5 to .6 feet AGL. These figures all assume that the ground is level. In reality, part of the Hammer property is slightly higher than the ACM property.

The circuit court concluded that there was substantial, credible evidence that the manner in which ACM has operated its airport has created the possibility of serious resulting accidents and

has put lives at risk. Further, the circuit court concluded that, because of the extremely low altitude that planes are flying near the Hammer home and in the RC flight path, excessive noise has been a problem.

In addition, the circuit court stated that it was not convinced that the proposed pattern change would eliminate the nuisance. The circuit court found that, while a pattern change would reduce the noise at the Hammer home, planes would still be flying at extremely low altitudes in the Hammer RC flight area and over County Road 207. The circuit court also found that ACM does not have a permanent tower or person on duty to inform incoming aircraft of the flight pattern.

 The circuit court's findings are not clearly against the preponderance of the evidence. Evidence at trial revealed that ACM's operation of its airport created a risk of serious harm to persons on the Hammer property and to motorists driving on County Road 207. Further, regardless of the cost to ACM and regardless of the benefit to Carroll County, this court has made it clear that "every man must so use his own property as not to injure that of his neighbor; and the fact that he has invested much money and employs many men in carrying on a lawful and useful business upon his land does not change the rule." *Meriwether Sand & Gravel Co. v. State*, 181 Ark. 216, 229, 26 S.W.2d 57, 62 (1930) (quoting *Strobel v. Kerr Salt Co.*, 58 N.E. 142, 147 (N.Y. 1900)). "[I]t matters not how well constructed or conducted a [business] may be, it is nevertheless a nuisance if it is so built as to destroy the comfort of persons owning and occupying adjoining premises, creating annoyances which render life uncomfortable, and it may be abated as a nuisance." *Baker v. Odom*, 258 Ark. 826, 831, 529 S.W.2d 138, 141 (1975) (quoting *Durfey v. Thalheimer*, 85 Ark. 544, 552, 109 S.W. 519, 522-23 (1908)). The circuit court did not err in concluding that ACM's operation of the airport was a nuisance.

Still, ACM contends that it has the right, pursuant to Arkansas Code Annotated section 27-116-102, to lawfully use its property for airplane operations. Section 27-116-102(c) provides:

> Flight in aircraft over the lands and waters of this state is lawful, unless at an altitude low enough to interfere with the then-existing use of which the land or water, or space over the land or water, is

put by the owner, or unless so conducted as to be dangerous or damaging to persons or property lawfully on the land or water beneath.

Stated another way, section 27-116-102(c) makes flight lawful, unless such flight amounts to a nuisance, trespass,[4] or otherwise poses a danger to the ground. *See Rodgers v. Erickson Air-Crane Co., LLC*, 740 A.2d 508, 513-14 (Del. Super. Ct. 1999) (construing a Delaware code provision that contained identical language to Arkansas Code Annotated section 27-116-102(c)). *See also Brandes v. Mitterling*, 196 P.2d 464, 468 (Ariz. 1948) ("Whether in landing, taking off, or otherwise, flight over another's land, so low as to interfere with the then existing use to which the land is put, is expressly outside the statutory definition of lawful flight; and being an unprivileged intrusion in the space above the land, such flight is a trespass.") (citing Restatement (First) of Torts § 159 (1934)); *Brentenson Wholesale, Inc. v. Ariz. Pub. Serv. Co.*, 803 P.2d 930, 934 (Ariz. Ct. App. 1990) ("Overflights can constitute a trespass.").

■ Here, the planes flew at an altitude low enough to interfere with the then-existing use of the Hammers' property and posed a danger to persons on the land beneath. Such flight amounted to a nuisance; therefore, it is not "lawful" flight pursuant to Arkansas Code Annotated section 27-116-102(c).

■ ■ ACM's final argument relates to damages, which were not sought by the Hammers. ACM appears to assert that the circuit court erred when it enjoined ACM's operation of the airfield because prior to entering an injunction to abate a nuisance, the circuit court is required to find damage to the property. There is no requirement that the circuit court is required to find physical damage to the property prior to issuing an injunction to abate the nuisance. *See Osborne, supra.* Moreover, there is no requirement in section 27-116-102(c) that an injured party must seek damages to maintain a nuisance suit. The Hammers demonstrated that the operation of the airport interfered with their then-existing use of

---

[4] In its brief on appeal, ACM makes a passing reference to the circuit court's conclusion that the operation of the airport constituted a trespass, but it does not directly challenge the conclusion, nor does it develop any argument demonstrating error.

their property and that the operation of the airport was so conducted as to be dangerous or damaging to persons or property lawfully on the land beneath.

For the foregoing reasons, we hold that the circuit court did not abuse its discretion in issuing an injunction to enjoin ACM from using its airfield for the purposes of allowing airplanes to land and depart therefrom.

Affirmed.